676 F.2d 925
 Catherine SANTISE, Appellee in 81-1904 & 81-2026,
Michael Stetsko, Appellee in 81-1905 & 81-2027,
Salvatore Altomonte, Appellee in 81-1906 & 81-2028,
Oliver McCauley, Appellee in 81-1907 & 81-2029,
Elfriede F. Simmons, Appellee in 81-1908 & 81-2030,
Joan M. Finucane, Appellee in 81-1909 & 81-2031,
Joseph Muscovitch, Appellee in 81-1910 & 81-2032,
Geraldine G. Roche, Appellee in 81-2722,
Faries L. Thomas, Appellee in 81-2725,
v.
Richard S. SCHWEIKER, Secretary of Health and Human
Services, Appellant.
 Nos. 81-1904 to 81-1910, 81-2026 to 81-2032, 81-2722 and 81-2725.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 15, 1981.
Decided April 8, 1982.
 
 J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., W. Hunt Dumont, U. S. Atty., Newark, N. J., G. Donald Haneke, Jerome B. Simandle, Asst. U. S. Attys., Trenton, N. J., Robert S. Greenspan, Anne Buxton Sobol (argued), Attys., Dept. of Justice, Washington, D. C., for appellant; Randolph W. Gaines, Chief of Litigation, Andrew E. Wakshul, Office of Gen. Counsel, Dept. of Health and Human Services, Baltimore, Md., of counsel.
 Louis E. Granata (argued), Yacker, Granata & Cleary, Matawan, N. J., for Santise, appellee in 81-1904 and 81-2026.
 Robert D. Rosenwasser, Somerset, N. J., for Stetsko, appellee in 81-1905 and 81-2027.
 Richard J. Bennett (argued), Middlesex County Legal Services Corp., New Brunswick, N. J., for Altomonte, appellee in 81-1906 and 81-2028.
 Richard J. Weber, Madnick, Milstein & Mason, Asbury Park, N. J., for McCauley, appellee in 81-1907 and 81-2029.
 Mark S. Jacobs, Alan L. Schwalbe (argued), Voorhees, N. J., for Simmons, appellee in 81-1908 and 81-2030.
 Joan M. Finucane, pro se in 81-1908 and 81-2031.
 Thomas M. Fulkowski, Freehold, N. J., for Muscovitch, appellee in 81-1910 and 81-2032.
 James B. Smith, Metuchen, N. J., for Roche, appellee in 81-2722.
 Steve Leder, Community Mental Health Law Project, Trenton, N. J., for Thomas, appellee in 81-2725.
 Before ADAMS, GIBBONS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 We are asked in this appeal to decide whether certain medical-vocational regulations promulgated by the Department of Health and Human Services ("HHS" or "Department") satisfy the requirements of the Social Security Act. The district court concluded that the regulations-which take the form of a "grid" and are used in determining eligibility for disability benefits-are at variance with both the Act and previous decisions of this Court. We disagree, and therefore will reverse.
 
 
 2
 * For more than a quarter-century, disabled workers and their dependents have been provided monetary benefits under the Social Security Act. Originally, the Social Security Act defined a disabled worker, or disability, in purely medical terms, without reference to vocational factors.[1] In 1967, however, Congress amended the statute to require explicitly that a decision as to an individual's disability take into account that person's potential for employment.[2] According to the amended Act, which remains in force today, a claimant is to be adjudged disabled
 
 
 3
 only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.
 
 
 4
 42 U.S.C. § 423(d)(2)(A). The statute proceeds to explain that "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country"; in this connection, it is irrelevant whether "such work exists in the immediate area in which (an individual) lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." Id.
 
 
 5
 In 1978, after giving interested parties an opportunity for notice and comment, HHS promulgated rules intended to implement the 1967 vocational amendment to the Act.[3] These rules establish a sequential decision-making process to be followed by an administrative law judge (ALJ) in a disability case. See 20 C.F.R. § 404.1520. First, the ALJ ascertains whether the applicant currently is working; if so, the claim is denied. Id. at § 404.1520(b). Second, the ALJ determines, solely on the basis of medical evidence, see id. at § 404.1526, whether the claimed impairment is "severe," that is, of a magnitude sufficient to limit significantly the individual's "physical or mental ability to do basic work activities"; if it is not, the claim is denied. Id. at § 404.1520(c). Third, the ALJ decides, again using only medical evidence, whether the impairment equals or exceeds in severity certain impairments described in Appendix 1 of the regulations; if it does, the claimant automatically is awarded disability benefits. Id. at § 404.1520(d). Fourth, the ALJ considers whether the applicant has sufficient "residual functional capacity"-defined as what an individual "can still do despite (his) limitations"-to perform his past work; if so, the claim is denied. Id. at § 404.1520(e); see id. at § 404.1545(a). Finally, the ALJ adjudicates, on the basis of the claimant's age, education, work experience, and residual functional capacity, whether the applicant can perform any other gainful and substantial work within the economy. Id. at § 404.1520(f). It is only during this final stage of the decisionmaking process that the ALJ is authorized to make use of the "grid"-i.e., the medical-vocational tables set out in Appendix 2 of the regulations-which is at issue in this proceeding.
 
 
 6
 Before employing the medical-vocational tables, however, an ALJ is obligated to make a number of factual findings about the applicant in question. Specifically, the claimant must be classified according to his or her age,[4] education,[5] prior work experience,[6] and residual functional capacity.[7] With regard to each of these factors, moreover, the claimant is permitted to introduce evidence and to rebut any evidence proffered by the Secretary. Id. at Appendix 2, § 200.00(a). It is only after this detailed inquiry as to an applicant's medical and vocational characteristics, therefore, that the regulatory tables invalidated by the district judge come into play.
 
 
 7
 The tables themselves are relatively straightforward in nature. In brief, they contain all possible combinations of the four relevant vocational factors-age, education, work experience, and residual functional capacity. With respect to each combination, the guidelines reveal whether an individual described by those particular characteristics is "disabled" or "not disabled"-that is, able or not able to engage in any other significant, gainful employment that exists in the national economy. In determining whether a claimant is eligible for disability benefits, therefore, an ALJ simply plots the applicant's "vocational profile" on an appropriate grid and arrives at the result indicated by the regulations for that specific combination of traits. For example, a person "closely approaching advanced age," with a "limited" educational background, no previous work experience, and the ability to perform light work would be classified as "not disabled" under the regulations. Id. at Appendix 2, Rule 202.10. By contrast, an individual of identical age, work experience, and residual functional capacity, who is "illiterate or unable to communicate in English" would be adjudged "disabled." Id. at Rule 202.09.[8] If a claimant's characteristics do not fit neatly into one of the many categories defined by the tables,[9] the ALJ is permitted to arrive at a conclusion as to disability independent of, but consonant with, the regulations.[10] If, however, an individual's medical-vocational status in fact is described by the grid, the regulations require that a particular decision be reached. Id. at § 404.1569 & Appendix 2.
 
 
 8
 According to HHS, underlying the regulations is the Secretary's determination, arrived at by taking administrative notice of relevant information,[11] "that a given number of unskilled jobs exist in the national economy that can be performed by persons with each level of residual functional capacity." Brief for Appellant at 14. For example, the Department has concluded that approximately 200 unskilled sedentary positions are available throughout the country, with each position representing "numerous jobs." See 20 C.F.R. part 404, Appendix 2, § 201.00(a). Similarly, the Department has identified 1600 unskilled positions for persons able to perform light work, and 2500 unskilled positions for those individuals with a maximum sustained work capability limited to medium work. Id. at Appendix 2, §§ 202.00(a) & 203.00(a). With respect to each table entry, or "rule," the Secretary has ascertained, by combining this administrative notice with expertise derived from previous experience in administering the disability program, the degree to which an individual's vocational factors will affect his chances of obtaining one of these many existing jobs. The regulations are accompanied by a detailed textual statement that explains and justifies each of the Department's medical-vocational rules.
 
 II
 
 9
 Nine cases have been consolidated for review on this appeal. In each instance, an ALJ determined, relying on the medical-vocational regulations described previously, that a particular claimant was not disabled. In each instance, upon appeal pursuant to 42 U.S.C. § 405(g), the district judge assumed, without deciding, that "substantial evidence" existed in the record to support the factual determinations reached by the ALJ-namely, that the claimant was a certain age, possessed a certain educational level and residual functional capacity, and had certain previous work experience. Santise v. Harris, 501 F.Supp. 274, 275 (D.N.J.1980). The district judge instead criticized, for two reasons, the grid system employed by HHS in disability cases.
 
 
 10
 First, the district court concluded that the medical-vocational regulations were "inconsistent with" and "contradictory to" the "plain language and meaning" of the Social Security Act. The Department, declared the court, was "clearly" obligated by 42 U.S.C. § 423(d)(2)(A) in each instance to "determin(e) as a matter of fact whether a claimant is capable of retaining 'substantial gainful work.' " HHS' regulatory arrangement, however, merely required an ALJ to identify four vocational characteristics about a particular applicant-and, having done so, the ALJ's task was "finished," since "the grid decides the 'fact' of whether the claimant is capable of retaining 'substantial gainful work.' " Such a result, the district judge believed, could not be squared with the mandates of the Act:
 
 
 11
 Simply put, the human function of judging cannot be replaced by a robotized resort to a grid. It is my conclusion that the Act requires that when a claimant is denied disability benefits that denial must be the product of individualized fact finding based on substantial evidence in the record. (HHS') new grid system is inconsistent with that principle.
 
 
 12
 Santise v. Harris, 501 F.Supp. at 277.
 
 
 13
 Second, the district court contended that the medical-vocational regulations could not be reconciled with previous decisions of this Court, namely, Livingston v. Califano, 614 F.2d 342 (3d Cir. 1980), Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979), and Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979). According to the district judge, those decisions establish that, once a claimant makes a prima facie showing of disability, the burden shifts to the Secretary to "come forward with evidence relating to the individual claimant and that claimant's ability to work." In most, although not necessarily all instances, such evidence would take the form of testimony by a vocational expert as to the work-related capabilities of the applicant. But regardless of whether such an expert participated in every disability proceeding, the crucial point made by the district court was that
 
 
 14
 (HHS') reliance on a grid, drawn in advance to cover a wide variety of individual cases, does not satisfy its obligation of basing its conclusion on substantial evidence. An abstract chart in a reference book, keyed to only four factors, does not provide the claimant with the individualized consideration of the facts of her own particular case that she is entitled to under the Act. Nor can a chart be cross-examined, nor can the claimant do anything to rebut it.
 
 
 15
 The trial court concluded, therefore, that "the newly promulgated regulations are at odds with the established judicial interpretation of the Act, which requires individualized treatment of each claim." Santise v. Harris, 501 F.Supp. at 276-77.
 
 
 16
 For these two reasons, the district judge held that HHS could not employ the medical-vocational regulations in making administrative determinations of disability.[12] The Department filed a timely appeal.[13]III
 
 
 17
 HHS' disability hearing system is "probably the largest adjudicative agency in the western world." J. Mashaw, C. Goetz, F. Goodman, W. Schwartz, P. Verkuil & M. Carrow, Social Security Hearings and Appeals: A Study of the Social Security Administration Hearing System xi (1978) (hereinafter cited as J. Mashaw). In fiscal 1976, for example, the agency's ALJs disposed of 180,000 cases; by contrast, during that same time period, only 130,000 civil and criminal matters were terminated by the entire Article III court system. Id. Approximately 8000 appeals were brought in 1978 from agency disability-related determinations to the federal district courts; this litigation "constitute(d) the largest portion of the workload of the federal judiciary from federal agencies." Dobrowolsky, supra, 606 F.2d at 409 n.18.
 
 
 18
 An agency that makes thousands upon thousands of individualized determinations as to disability each year will inevitably at times treat similarly situated persons differently. It is not surprising, therefore, that HHS was subjected to considerable criticism with respect to what some perceived to be the agency's failure to "produce predictable and consistent results." Mashaw, Conflict and Compromise Among Models of Administrative Justice, 1981 Duke L.J. 181, 182 & n.4 (collecting congressional and executive critiques of the disability-hearing process). One academic study concluded, for example, that "(t)he inconsistency of the disability process is patent. Indeed, it is widely believed that the outcome of cases depends more on who decides the case than on what the facts are." J. Mashaw, supra, at xxi. Such a state of affairs, of course, is difficult to accept:
 
 
 19
 Perhaps no characteristic of a procedural system is so uniformly denounced as a tendency to produce inconsistent results. When disposition depends more on which judge is assigned to the case than on the facts or the legal rules, the tendency is to describe the system as lawless, arbitrary, or the like, even though the case assignment is random.
 
 Id. at 19.[14]
 
 20
 The medical-vocational regulations at issue on this appeal were designed by HHS in large part to remedy the problem created by the disparity of rulings on the part of ALJs. The Department has attempted to derive detailed standards, covering a host of situations, and has mandated that individual cases be decided in accordance with those promulgated standards. The regulations are intended to ensure that "the claims of all individuals similarly situated are handled in a fair and consistent manner" and that "determinations made by one set of adjudicators on the basis of the same facts will be handled the same way by another group of adjudicators, wherever in the country they are located." 43 Fed.Reg. 55,34 9, 55,362 (1978). According to HHS, the regulations will "promote more equitable, consistent and understandable decisions." Id. at 55,355. See also Goldhammer, The Effect of New Vocational Regulations on Social Security and Supplemental Security Income Disability Claims, 32 Ad.L.Rev. 501, 504-05 (1980).
 
 
 21
 There are, however, obvious risks associated with such an approach: the more precisely the disability standards are formulated, the greater is the possibility that ALJ adjudications will not be "individualized."[15] Indeed, many of the statements received by the Department from members of the public during the notice and comment period reflected just such a concern. It was feared that the agency, particularly by issuing the medical-vocational tables in Appendix 2, was attempting to abandon its long-standing commitment to "individualized adjudication" and to adopt in its stead an "average man" approach. See 43 Fed.Reg. 55,349, 55,355-56 (1978). In this regard, it should be recalled that the district court invalidated the regulations precisely because of their alleged failure to provide for "individualized consideration" of all relevant facts about a claimant. Santise v. Harris, 501 F.Supp. at 276. The appellees, of course, press similar arguments upon this Court.
 
 
 22
 The underlying issue involved in this appeal can be stated simply: whether HHS has the authority, both under the Act and under previous judicial decisions, to pursue the goal of greater uniformity by issuing regulations that may result, at least to some extent, in a lesser degree of individualized consideration of claimants' characteristics. For the reasons that follow, we answer this inquiry in the affirmative.
 
 IV
 
 23
 While the question of the conformity of HHS' medical-vocational regulations with the Social Security Act is a matter of first impression in this Circuit, we note that many other federal courts previously have passed on, either directly or indirectly, the validity of the grid system challenged here. Although some of these decisions contain expressions of disquietude over the impact and application of the regulations,[16] and although in a number of instances determinations made in accordance with the regulations have been voided, in whole or in part, by judicial decree,[17] in the majority of the cases, the Department's disability guidelines have received either explicit[18] or implicit[19] endorsement by the courts. After careful consideration of the appellees' arguments, we join this majority.
 
 
 24
 * Little need be said, as an initial matter, about HHS' authority to promulgate legislative regulations designed to implement the Social Security Act. By statute, Congress has vested in the Secretary of HHS the power to issue rules "not inconsistent with the provisions of this title (and) necessary or appropriate to carry out (its) provisions." 42 U.S.C. § 405(a).[20] More specifically, the Secretary is authorized to establish regulations governing determinations of disability; that is, to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits (under Title II of the Act)." Id.
 
 
 25
 The claimants insist that what would appear to be a sweeping statutory grant should be interpreted so as to prohibit the Department from adopting anything other than "procedural" regulations, however they might be defined. We find no support for such a proposition. By its very terms, section 405(a) is conjunctive in nature: the Secretary is accorded "full power and authority to make rules and regulations and to establish procedures" in order to administer the Act. It is well established, moreover, that Congress may "delegate ( ) broad powers to executives to determine (through implementing regulations) the details of any legislative scheme." United States v. Rock Royal Co-operative Inc., 307 U.S. 533, 574, 59 S.Ct. 993, 1013, 83 L.Ed. 1446 (1939). From our vantage point, section 405(a) appears to contain precisely such an explicit delegation of legislative authority: Congress has charged the Department with the responsibility of adopting statutory-type rules in order to give practical effect to the disability insurance program established by the Act.
 
 
 26
 Two recent Supreme Court decisions, both of which rejected various challenges to legislative regulations promulgated by HHS, are instructive as to the appropriate standard of judicial review to be applied in a case such as the present one. In Batterton v. Francis, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), in the course of upholding a regulatory definition of "unemployment" issued in connection with Title IV of the Social Security Act, the Court stressed that Congress had "expressly delegated " to the Department the power to prescribe standards defining "unemployment" for Title IV purposes. In such a situation,
 
 
 27
 Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner.... (T)he regulation at issue in this case is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 
 28
 Id. at 425-26, 97 S.Ct. at 2405-06 (citations and footnotes omitted). Subsequently, in connection with regulations implementing provisions of Title XIX of the Act, the Court reiterated this "limited" standard of review. Schweiker v. Gray Panthers, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). After taking note of the "byzantine construction" of the statutory scheme, the Justices observed that Congress, "(p)erhaps appreciating the complexity of what it had wrought" conferred on the Secretary "exceptionally broad authority to prescribe standards for applying certain sections of the Act." Accordingly, an HHS regulation establishing criteria for Medicaid eligibility was entitled to "legislative effect," and a reviewing court's only obligations were to ensure that "the Secretary did not 'excee(d) his statutory authority' and that the regulation is not arbitrary or capricious." Id. at 43-44, 101 S.Ct. at 2640.[21] See also Buczynski v. General Motors Corp., 616 F.2d 1238, 1242-43 (3d Cir. 1980), aff'd sub nom. Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); Baker v. Otis Elevator Co., 609 F.2d 686, 691 (3d Cir. 1979).
 
 
 29
 Applying the standard of review enunciated in Batterton and Gray Panthers, we conclude that, in promulgating the medical-vocational regulations before us today, the Department did not exceed its statutory authority, act arbitrarily or capriciously, or in any way abuse its discretion. On the contrary, we are of the opinion that the regulations are " 'reasonably related to the purposes of the enabling legislation,' " Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (quoting Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 280-81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)), and consequently should be upheld as "a legitimate, reasonable, and direct adjunct to the power expressly conferred," Stallings v. Harris, 493 F.Supp. 956, 958 (W.D.Tenn.1980).
 
 
 30
 In this connection, we cannot accept the district court's contention that HHS' use of the vocational grids is "contradictory to the plain language and meaning" of 42 U.S.C. § 423(d)(2)(A). Santise v. Harris, 501 F.Supp. at 277. While certain court decisions-handed down, it should be noted, before these regulations took effect-stand for the proposition that an ALJ must identify specific jobs capable of being filled by a claimant, see, e.g., Bastien v. Califano, 572 F.2d 908, 912-13 (2d Cir. 1978), or for the proposition that a vocational expert's testimony is, if not always necessary, at least highly desirable, see, e.g., Garrett v. Richardson, 471 F.2d 598, 603-04 (8th Cir. 1972), the statute by its terms does not require as much. What the statute does demand is that the denial of disability benefits be the product of individualized fact finding, i.e., that disability claims be evaluated on a case-by-case method, taking into account each applicant's peculiar vocational, medical, chronological, and educational characteristics. And under the new regulations, this remains very much the central concern of the disability proceeding.
 
 
 31
 Under the regulations themselves, before the medical-vocational guidelines contained in Table 2 can be applied, complete consideration of all of an applicant's relevant characteristics is required. Before resorting to the grid, an ALJ must investigate, and make specific findings about, a claimant's residual functional capacity, age, education, and work experience. Each of these findings must be supported in the record by substantial evidence. 42 U.S.C. § 405(g). With respect to each such finding, moreover, the applicant is given an opportunity both to introduce evidence of his own and to contest any evidence proffered by representatives of the Secretary. See 20 C.F.R. part 404, Appendix 2, § 200.00(a).[22] It is only after the person seeking benefits has been thoroughly evaluated in light of the factors specifically delineated by Congress in section 423(d)(2)(A) that the decisionmaking process can be termed, in any meaningful sense, "mechanical"; only at this point does the ALJ consult the grid to determine whether any job exists in the national economy that can be performed by an individual with such characteristics.
 
 
 32
 Moreover, it must be kept in mind that the grids do not govern-and indeed were not intended to govern-all disability cases. For example, the regulations specifically dictate that "a conclusion of disabled or not disabled is not directed" if an individual's vocational profile is not precisely contained in Appendix 2. 20 C.F.R. § 404.1569 & Appendix 2, § 200.00(d); see Thomas v. Schweiker, 666 F.2d 999, 1004 (5th Cir. 1982) ("use of the Guidelines is inappropriate where their evidentiary underpinnings do not coincide exactly with the evidence of disability appearing on the record" (emphasis added)). Similarly, the rules "may not be fully applicable" where a claimant suffers from non-exertional, instead of or in addition to exertional, impairments. 20 C.F.R., part 404, Appendix 2, § 200.00(e); see Walker v. Harris, 504 F.Supp. 806, 811 (D.Kan.1980) (holding that testimony from a vocational expert is necessary where the applicant possesses non-exertional problems). Then, too, the regulations themselves provide that they are to be of only limited help when it is established that a claimant is unable either to perform a full range of work at a certain level of functional capacity, or to perform such work on a sustained basis. 20 C.F.R. part 404, Appendix 2, §§ 200.00(c) & (d); see Proctor v. Schweiker, 526 F.Supp. 70, 75-76 (D.Md.1981). The caselaw to date indicates that courts have been quite vigilant in policing these as well as other boundaries contained in HHS' regulatory scheme. See note 19 supra (collecting cases).
 
 
 33
 Even when focusing on the grids alone, however, we are unpersuaded that their use inhibits any purpose meant to be realized by the Act. Thus, it is quite possible "that claimants will be found disabled under the new regulations who would not have been found disabled under previous adjudicatory practices." Goldhammer, supra, at 506 (emphasis added); see Frady v. Harris, 646 F.2d 143, 145 (4th Cir. 1981) ("the regulations may ... in many cases enhance the likelihood of qualification by applicants for benefits"); see also cases cited at note 12 supra.[23] More to the point, the Secretary must be able somehow to demonstrate that an individual with certain characteristics who claims to be disabled in fact is capable of performing certain tasks. The Secretary must persuade an ALJ-and ultimately, in most cases, a court-that jobs exist in the national economy that the claimant is able to fill. One possible method of satisfying this burden, of course, might be to introduce testimony from a vocational expert as to which, if any, positions can be performed by a person possessing the applicant's particular skills; courts have long found such a process to be consonant with the requirements of the Act. See, e.g., Dobrowolsky, supra, 606 F.2d at 409-10 & n.20. It is difficult to understand, however, why a similar function cannot be served by the medical-vocational tables, which, after all, are based on "the same sources (e.g., Department of Labor studies) which a vocational expert would consult in determining whether a particular claimant's abilities matches a job's requirements." Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 530 (6th Cir. 1981). Indeed, if anything, the new regulations are likely to increase the accuracy of determinations involving the availability vel non of certain unskilled jobs in the economy, inasmuch as "the ad hoc judgments of administrative law judges based on the testimony of vocational experts and other witnesses and on their own limited and variable knowledge of the labor market," derived from identified and public documents, and "supplement(ed) and draw(n) upon ... in a rulemaking proceeding," Cummins v. Schweiker, 670 F.2d 81, 83 (7th Cir. 1982).
 
 
 34
 In sum, we believe that the degree of individualized consideration afforded to applicants for disability benefits is not significantly lessened by the Department's medical-vocational guidelines. Even were we persuaded, however, that the disability regulations, in practice, do lead to a somewhat more "mechanical" review process, we find nothing in either the Social Security Act or its legislative history[24] that would prohibit the Department from acting in such a manner to obtain more uniform results with respect to claimants with similar degrees of disability. We conclude, therefore, that the district court erred in holding that the medical-vocational guidelines are "inconsistent with" and "contradictory to" the requirements of the Act.
 
 B
 
 35
 The district court also determined that the medical-vocational regulations could not be harmonized with previous decisions of this Circuit, specifically, Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979), Livingston v. Califano, 614 F.2d 342 (3d Cir. 1980), and Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). In Rossi, for example, our Court declared that once an applicant has demonstrated an inability to perform his or her prior job, "the burden of proof shifts to the Secretary to show that the claimant, given her age, education and work experience, has the capacity to perform specific jobs that exist in the national economy." 602 F.2d at 57 (emphasis added). Similarly, in Livingston, we observed that "the Secretary must establish that the claimant has the ability to engage in alternative substantial gainful employment activity." 614 F.2d at 345. And in Dobrowolsky, after noting that " 'due regard for the beneficent purposes of the legislation' " required that "leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed," 606 F.2d at 407 (quoting Hess v. Secretary of HEW, 497 F.2d 837, 840 (3d Cir. 1974)), we stressed that, in order for an administrative determination of non-disability to be supported by substantial evidence,
 
 
 36
 "(i)t is not enough for (an ALJ, relying on the testimony of a vocational expert,) to point vaguely to a narrow area of possible employment and assert that such work is suitable.... (Rather, it) must be shown by competent medical testimony that the claimant is capable of performing the physical activities that the jobs available to him require."
 
 
 37
 606 F.2d at 410 (quoting DeMandre v. Weinberger, 414 F.Supp. 784, 787 (E.D.La.1976)). After examining these three cases, the district judge asserted that "(i)t is easily seen" that the analysis employed by an ALJ under the new regulations "differs from the analysis required by decisions of the Third Circuit which explicate (HHS') obligations under the Act." Santise v. Harris, 501 F.Supp. at 276.[25]
 
 
 38
 Were we convinced that the district court had correctly interpreted the thrust of our disability-related caselaw, we would be required to ascertain whether HHS, in effect, could "overrule" precedents of this Court by promulgating administrative regulations at odds with those decisions. It is unnecessary to consider or resolve this question, however, for we believe that the Department's new guidelines may be synchronized with our opinions.
 
 
 39
 In fact, if the situations involved in Rossi, Livingston, and Dobrowolsky were to occur again under the regulations, we believe that the outcome, in each instance, would be the same. In Rossi, a determination of non-disability was reversed because there was neither a finding by the ALJ nor any evidence in the record bearing on the possibility of alternative employment for the claimant. 602 F.2d at 57. In a properly conducted hearing under the medical-vocational regulations, however, similar defects should not arise: before an ALJ can pronounce an applicant "not disabled," he specifically must consider that person's vocational characteristics, and chart those characteristics with precision on an elaborate grid designed to reveal whether alternative employment is available for such an individual. In Livingston, the ALJ failed adequately to develop the record; he rejected an applicant's request for disability benefits without considering whether the applicant was disabled per se (by reason of possessing an impairment listed in Appendix 1 of the regulations, see 20 C.F.R. § 404.1520(d)) and without considering his age, education, and work experience. 614 F.2d at 346. If, under the Department's new guidelines, an ALJ fails to consider such matters, his decision also would be subject to reversal under Livingston. Finally, in Dobrowolsky, the primary concern of the Court was that a vocational expert had arrived at a legal conclusion-namely, that the applicant was not disabled-solely by making "conclusory statements" about certain medical evidence. 606 F.2d at 409. In particular, we objected to the fact that, "(a)lthough the ALJ asked the expert to take into consideration Dobrowolsky's age, education, and work experience in considering what jobs were available, there is no evidence that these factors were given the careful consideration they deserve." Id. at 409 n.19. Under the new regulations, a similar finding of non-disability would not be sustained, for the same reasons this Court identified in Dobrowolsky.[26]
 
 
 40
 What this discussion should make clear is that the regulations challenged here do not shift, or attempt to shift, the Secretary's burden of proof in disability matters. It remains true, even under the regulations, that once the claimant has "carr(ied) the initial burden of demonstrating by medical evidence that he is unable to return to his former occupation," Dobrowolsky, 606 F.2d at 406, the Secretary must establish-with "substantial evidence," 42 U.S.C. § 405(g)-that the applicant, in view of his age, education, work experience, and degree of impairment, "has the ability to engage in alternative substantial gainful employment activity," Livingston, 614 F.2d at 345. To be sure, the regulations set forth a new means of meeting that burden-the taking of administrative notice of the general availability of jobs, as opposed to reliance on the identification of specific tasks by a vocational expert-but the Secretary's ultimate responsibility for rebutting a claimant's prima facie showing of disability remains unchanged. And we have no doubt that, under the new regulations, the Secretary's responsibility will continue to be "strictly construed," Dobrowolsky, 606 F.2d at 407.
 
 
 41
 As for the "requirement," first articulated in Rossi, that the Secretary identify specific jobs capable of being performed by a disability claimant, we stress that the Social Security Act, by its terms, does not place such an obligation upon the Department. Rather, this "judicially imposed standard (was) designed to ensure that each claimant's own particular characteristics ... are given full consideration" by an ALJ and a reviewing court, Leonard v. Harris, No. 79-2645, slip op. at 4 (W.D.Tenn.1980). And we are persuaded that this same objective can be realized if administrative notice is substituted for statements that would have been made by vocational experts. While determinations of non-disability under the new regulations will no longer be accompanied by a listing of specific jobs that a claimant can perform, it would appear sufficient, for purposes of the substantial evidence test, for the Secretary to demonstrate, to the satisfaction of a reviewing court, that there exist many jobs capable of being filled by an individual with the claimant's characteristics.[27] Putting the same point somewhat differently, we see no reason for the Secretary to isolate and describe specific jobs when the regulations themselves stand for the proposition that there exist 200 sedentary unskilled jobs (or 1600 unskilled light jobs, or 2500 unskilled medium-level jobs) available in the economy and capable of being filled by the individual under evaluation.
 
 
 42
 In this regard, we follow the approach adopted recently by the Sixth Circuit in Kirk v. Secretary of Health and Human Services, 667 F.2d 524 (6th Cir. 1981). That court previously had held that HHS was required to identify "specific types of jobs" suitable for an individual deemed "not disabled" by an ALJ. Hephner v. Mathews, 574 F.2d 359, 363 (6th Cir. 1978). In the course of upholding the validity of the same medical-vocational regulations at issue here, however, the court concluded that it was not constrained, in any meaningful way, by the Hephner specificity requirement. The court's extended discussion on this point is instructive:
 
 
 43
 Hephner, decided before the grid at issue here became the applicable law, does not require rejection of the grid. Hephner's interpretation and rationale is still applicable and its demands are satisfied by use of the grid. The grid too requires that a claimant's particular characteristics be evaluated before a disability determination is reached; the grid merely identifies the weight to be given each characteristic found. The grid has displaced the Secretary's burden of demonstrating which particular jobs the claimant can perform. But, that does not render the regulations invalid. The grid itself takes into account the same sources which a vocational expert would consult in determining whether a particular claimant's abilities matches a job's requirements, yet provides greater uniformity with fewer administrative costs. We find that, even though expert vocational testimony is no longer necessary, use of the grid substantially comports with prior case law interpreting the Social Security Act.
 
 
 44
 667 F.2d at 530. Like the Sixth Circuit, and for many of the same reasons, we believe that HHS' disability regulations are not at variance with established caselaw. Accordingly, we hold that the district court erred in concluding that the guidelines could not be reconciled with the relevant precedents of this Circuit.
 
 V
 
 45
 The decision of the district court will be reversed, and these cases will be remanded to that court for further proceedings consistent with this opinion.
 
 
 
 [1]
 "Disability" was-and is-defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" of a specified duration. Pub.L.No.84-880, § 103(a), 70 Stat. 807, 815 (1956) (current version at 42 U.S.C. § 423(d)(1)(A))
 
 
 [2]
 The legislative history that accompanies this revision reveals congressional concern over "the rising cost of the disability insurance program" caused in part because "the definition of disability (had) been eroded" by previous judicial decisions. In order to correct this perceived problem, Congress adopted "more precise guidelines ... to be used in determining the degree of disability which must exist in order to qualify for disability insurance benefits." S.Rep. No. 90-744, 90th Cong., 1st Sess., reprinted in (1967) U.S.Code Cong. & Ad.News 2834, 2880
 
 
 [3]
 The regulations were issued by HHS in March 1978, 43 Fed.Reg. 9248 (1978), were promulgated on November 26, 1978, 43 Fed.Reg. 55,349 (1978), became effective on February 26, 1979, and were rewritten on August 20, 1980, 45 Fed.Reg. 55,566 (1980). Because they are used in making disability determinations under both the Federal Old-Age, Survivors, and Disability Insurance Benefits program (Title II of the Social Security Act) and the Supplemental Security Income for the Aged, Blind, or Disabled program (Title XVI of the Act), the regulations are codified, in virtually identical form, at 20 C.F.R. part 404, subpart P (governing Title II claims) and 20 C.F.R. part 416, subpart I (governing Title XVI claims). Reference will be made throughout this opinion to the version that accompanies Title II, see 20 C.F.R. §§ 404.1501-.1598 & Appendices (1981)
 
 
 [4]
 According to the regulations, " '(a)ge' refers to how old you are (your chronological age) and the extent to which your age affects your ability to adapt to a new work situation and to do work in competition with others." 20 C.F.R. § 404.1563. The regulations establish the following age-related categories: "closely approaching retirement age (60-64)"; "advanced age (55-59)"; "closely approaching advanced age (50-54)"; "younger person age 45-49"; and "younger person age 18-44." Id. & Appendix 2. The Department has allowed, however, that it "will not apply these age categories mechanically in a borderline situation." Id. at § 404.1563(a)
 
 
 [5]
 There are four education-related categories established by the regulations: "high school graduate or more"; "limited or less"; "marginal or none"; and "illiterate or unable to communicate in English." 20 C.F.R. § 404.1564 & Appendix 2. An individual's education level ordinarily is ascertained by measuring the amount of any "formal schooling or other training which contributes to (his) ability to meet vocational requirements," but evidence relating to test scores, past work experience and responsibilities, and daily activities also may be considered. Id. at § 404.1564(a)
 
 
 [6]
 The regulations enunciate the following "work experience" categories: "skilled or semiskilled-skills transferable"; "skilled or semiskilled-skills not transferable"; "unskilled"; and "none." 20 C.F.R. § 404.1565 & Appendix 2
 
 
 [7]
 The regulations define "residual functional capacity" as the level of work that an individual is able to perform in spite of his various physical and mental impairments. 20 C.F.R. § 404.1545. For purposes of the disability program, the Department has defined three levels of residual functional capacity: "maximum sustained work capability limited to medium work"; "maximum sustained work capability limited to light work"; and "maximum sustained work capability limited to sedentary work." Id. & Appendix 2
 
 
 [8]
 In the lead case on this appeal, the ALJ determined that Ms. Santise possessed a residual functional capacity for light work, was a "younger individual," had a high school education and a semi-skilled work background, and therefore was "not disabled" pursuant to Rule 202.21 of the regulations. Santise v. Harris, 501 F.Supp. 274, 275-76 (D.N.J.1980)
 
 
 [9]
 This would be the case primarily in either of two situations: an applicant falls between the various definitional categories established by the regulations (e.g., the individual can perform more than light but less than medium work), see 20 C.F.R. part 404, Appendix 2, § 200.00(d); or an applicant has certain non-exertional impairments (e.g., a psychotic headache; a sensory or skin disorder) in addition to exertional limitations, see id. at Appendix 2, § 200.00(e)
 
 
 [10]
 The regulations provide that where "an individual's specific profile is not listed within ... Appendix 2, a conclusion of disabled or not disabled is not directed." Nonetheless, even in this situation, the rules are to be used for "guidance" and in order to establish a "frame of reference" for decisionmaking by the ALJ. 20 C.F.R. part 404, Appendix 2, § 202.00(d)
 
 
 [11]
 The Secretary's administrative notice was based on and derived from statistics contained in a number of publications of the Department of Labor, the Bureau of the Census, and the Social Security Administration. See 20 C.F.R. part 404, Appendix 2, § 200.00(b)
 
 
 [12]
 Specifically, the district court held that the Department could not rely on 20 C.F.R. § 404.1569 & Appendix 2 in order to reach a finding that an applicant was "not disabled." The court stressed, however, that nothing in its decision was intended to call into question recent decisions such as Irwin v. Harris, 627 F.2d 1090 (6th Cir. 1980), Parker v. Harris, 626 F.2d 225 (2d Cir. 1980), or Hicks v. Califano, 600 F.2d 1048 (4th Cir. 1979), where HHS was ordered to grant disability benefits to those individuals classified as "disabled" by the grid. While HHS could "continue to rely on the grid in granting benefits, it simply may not do so in denying benefits." Santise v. Harris, 501 F.Supp. at 278. Consequently, the district court remanded the cases consolidated on this appeal to the agency for further proceedings
 
 
 [13]
 After the district court denied the Secretary's motion for reconsideration in these cases, the Department filed notices of appeal with this Court, contending that the district court's decision constituted an appealable final order under 28 U.S.C. § 1291. Because of the significance of the issue, however, the Department subsequently filed motions for certification pursuant to 28 U.S.C. § 1292(b), which were issued by the district court on May 21, 1981, and granted by this Court on June 11, 1981
 
 
 [14]
 In order to achieve greater uniformity in disability claim determinations, the Mashaw study considered three possible reforms. One was rejected out of hand as politically unacceptable and administratively cumbersome: namely, that each ALJ be instructed to make a finding of disability in only a certain percentage of the cases he reviews. The reform preferred by the authors was that a panel system be deployed-i.e., three ALJs would consider the merits of each disability claim. As a purely statistical matter, the variance in outcomes between these panel decisions and the decisions presently rendered by ALJs sitting alone would be significantly less. Recognizing that such a three-judge approach might entail "quite staggering" administrative costs, the authors also recommended "the development and enforcement of better decisional standards ... that reduce individual ALJ discretion by providing per se rules, presumptions, or the like." See J. Mashaw, supra, at 24-27. HHS, in developing the medical-vocational regulations, appears to have followed this last recommendation
 
 
 [15]
 To make this point, the district court quoted one commentator's observation about criminal sentencing procedures:
 Rigidity provides uniformity, but uniformity does not necessarily provide justice. Situations which appear similar usually contain some unique characteristics. Decisionmaking done in accordance with a rigid adherence to rules cannot take these differences into account. When the unique characteristics of a particular situation alter the effect of a decision in some fundamental way, rigid application of a rule creates injustice.
 Santise v. Harris, 501 F.Supp. at 276 (quoting Note, Sentencing Women: Equal Protection in the Context of Discretionary Decisionmaking, 6 Women's Rights L.Rep. 85, 94 (1980)). Compare Aristotle, Nicomachaen Ethics § 1137b ("all law is universal, whereas there are some things about which it is not possible to make a universal statement that shall be correct").
 
 
 [16]
 See Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981) (criticizing the administrative notice aspect of the regulations-i.e., the Secretary's failure to identify "specific alternative occupations available in the national economy that would be suitable for the claimant"-but remanding on other grounds); Perez v. Schweiker, 653 F.2d 997, 1000-01 (5th Cir. 1981) (criticizing the regulations because "a human being with particular and unique problems is declared disabled or not based upon an impersonal and mechanical formula," but remanding on other grounds); Frady v. Harris, 646 F.2d 143, 145 (4th Cir. 1981) (Hall, J., dissenting) ("The Secretary has exhibited a complete disregard of the procedural standards adopted by this Court, all under the guise of an administrative table purportedly designed to save time and money"); Stewart v. Harris, 508 F.Supp. 345 (D.N.J.1981) (questioning the regulations, but remanding on other grounds); Colyer v. Harris, 519 F.Supp. 692 (S.D.Ohio 1981) (concern regarding retroactive application of the regulations)
 
 
 [17]
 See Campbell v. Secretary of Dep't of Health & Human Servs., 665 F.2d 48, 53 (2d Cir. 1981) (invalidating finding of non-disability because the ALJ failed to provide "adequate evidence of a claimant's ability to perform a specific alternative occupation"); McDonald v. Harris, No. 80-0348-H (S.D.Ala. Feb. 10, 1981); Blanchette v. Schweiker, 523 F.Supp. 338 (D.Colo.1981); Phillips v. Harris, 488 F.Supp. 1161 (W.D.Va.1980); Wilson v. Harris, 496 F.Supp. 746, 748 (E.D.Wis.1980) ("the table simply assumes the critical fact in the dispute"); Schmidt v. Harris, No. C-79-2080 (N.D.Iowa June 19, 1980) ("The Secretary should not be permitted to, in effect, manufacture her own evidence"). Some courts have found particularly objectionable the failure of the regulations to require the testimony of a vocational expert in some or all situations. See Powell v. Schweiker, 516 F.Supp. 1001 (W.D.Ark.1981); Pitcock v. Schweiker, 520 F.Supp. 1117 (E.D.Ark.1981); Fisher v. Schweiker, 514 F.Supp. 119 (W.D.Mo.1981); Freeman v. Harris, 509 F.Supp. 96 (D.S.C.1981); Hammonds v. Schweiker, 531 F.Supp. 42 (W.D.Mo.1981); Williams v. Harris, 500 F.Supp. 214 (W.D.N.C.1980); Maurer v. Harris, 502 F.Supp. 320 (D.Or.1980). Other courts have concluded that the regulations do not obviate the Secretary's obligation to identify specific jobs that the claimant is capable of filling. See Hogan v. Schweiker, Civ. 532 F.Supp. 639 (D.Colo.1982); Ramos v. Secretary of Health & Human Servs., 514 F.Supp. 57 (D.P.R.1981); Burkett v. Harris, Civ. No. 79-1270 (M.D.Pa. Apr. 13, 1981)
 
 
 [18]
 See Cummins v. Schweiker, 670 F.2d 81, 83 (7th Cir. 1982) ("it was not only lawful ... but highly appropriate, for the Secretary to try to streamline the adjudication of social security disability cases and bring about some greater uniformity in the results of these adjudications"); Kirk v. Secretary of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981) (upholding regulations against a host of statutory and constitutional attacks), Salinas v. Schweiker, 662 F.2d 345 (5th Cir. 1981); Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981) ("the existence in the economy of jobs which a person with (the claimant's) qualifications could fill being established by administrative notice, ... we are left with no alternative but to affirm the Secretary's determination that the applicant was not disabled"); Geoffroy v. Secretary of Health & Human Servs., 663 F.2d 315 (1st Cir. 1981) (approving regulations, but reserving question whether an ALJ still must "ritualistically" list specific jobs capable of being performed by the applicant); Simonsen v. Secretary of Health & Human Servs., 512 F.Supp. 1064 (S.D.Cal.1981); Sweet v. Harris, Civ. No. 80-1415 (D.N.J. Mar. 31, 1981); Burton v. Schweiker, 512 F.Supp. 913 (W.D.Pa.1981); Sloan v. Secretary of Health & Human Servs., 512 F.Supp. 1296 (N.D.W.Va.1981); Boyce v. Harris, 492 F.Supp. 751 (D.S.C.1980); Stallings v. Harris, 493 F.Supp. 956 (W.D.Tenn.1980), aff'd, Kirk v. Secretary of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981); Leonard v. Harris, No. 79-2645 (W.D.Tenn.1980), aff'd, Kirk v. Secretary of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981); New v. Harris, 505 F.Supp. 721 (S.D.Ohio 1980)
 
 
 [19]
 Some courts have assumed that the regulations were valid, but reversed an ALJ's finding of non-disability because of misapplication of those guidelines. See Thomas v. Schweiker, 666 F.2d 999 (5th Cir. 1982); Gaines v. Secretary of Health & Human Servs., 657 F.2d 99 (6th Cir. 1981); Roberts v. Schweiker, 667 F.2d 1143 (4th Cir. 1981) (per curiam); Smith v. Schweiker, 520 F.Supp. 27 (D.N.H.1981); Proctor v. Schweiker, 526 F.Supp. 70 (D.Md.1981); Deutsch v. Harris, 511 F.Supp. 244 (S.D.N.Y.1981); Walker v. Harris, 504 F.Supp. 806 (D.Kan.1980), Moguez v. Harris, 512 F.Supp. 11 (D.Colo.1980). Other courts have upheld administrative determinations of disability reached by following the regulations, without directly discussing their validity. See Thomas v. Secretary of Health & Human Servs., 659 F.2d 8 (1st Cir. 1981); Fogg v. Schweiker, No. 81-1232 (1st Cir. Oct. 13, 1981); Ward v. Harris, 515 F.Supp. 859 (W.D.Okla.1981); Crowe v. Harris, 489 F.Supp. 683 (E.D.Tenn.1980); Halsted v. Harris, 489 F.Supp. 521 (E.D.Mo.1980)
 
 
 [20]
 The section provides in full:
 The Secretary shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this title, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.
 42 U.S.C. § 405(a).
 
 
 [21]
 The rule of Batterton and Gray Panthers can be viewed as a logical extension of a fundamental canon of administrative law: namely, that "great deference" be accorded "the interpretation given (a) statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); see, e.g., EPA v. National Crushed Stone Assoc., 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980); Miller v. Youakim, 440 U.S. 125, 144 n.25, 99 S.Ct. 957, 969, 59 L.Ed.2d 194 (1979); Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978); NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974)
 
 
 [22]
 "Those who criticize the new regulations ... fail to recognize that (they) interfere with individualized adjudication only in a very limited way. The administrative law judge still has to determine the residual functional capacity of the individual, and it is usually that capacity which is the determinative issue in a disability case." Goldhammer, The Effect of New Vocational Regulations on Social Security and Supplemental Security Income Disability Claims, 32 Ad.L.Rev. 501, 509 (1980)
 
 
 [23]
 In explanatory material accompanying the regulations, HHS sought to reassure those members of the public who feared that the definitions incorporated in Appendix 2 were intended to, or would have the effect of, increasing the denial rate for disability applications: "We believe that the regulations will not have any significant effect on the current allowance-denial rates. Rather than abridge claimants' rights, the regulations will provide information about the applicable rules, and will promote more equitable, consistent and understandable decisions." 43 Fed.Reg. 55,349, 55,355 (1978)
 
 
 [24]
 The Department contends that "(t)he legislative history surrounding their promulgation supports the conclusion that Congress intended the medical-vocational regulations to be accorded legislative effect." Brief for Appellant at 37. Specifically, HHS points to the following evidence: (a) As early as 1954, Congress urged that the Social Security Administration develop standards in order to "promote equal treatment of all disabled individuals" and guarantee uniform handling of claims, see S.Rep.No.1987, 83d Cong., 2d Sess., reprinted in (1954) U.S.Code Cong. & Ad.News 3710, 3730-31; (b) A congressional subcommittee in 1960 called upon the agency to develop, in the form of regulations, "specific criteria for the weight to be given non-medical factors in the evaluation of disability," see Subcomm. on the Administration of the Social Security Laws of the House Comm. on Ways and Means, 86th Cong., Administration of the Social Security Disability Insurance Program 17-18 (Comm. Print 1959-1960); (c) In 1974, the agency was asked to determine whether the definition of disability contained in the Act, as amended in 1967, could be "stated more specifically in the law or regulation," see Staff of House Comm. on Ways and Means, 93d Cong., 2d Sess., Report on Disability Insurance Program 6 (Comm. Print 1974); (d) In 1976, the agency was criticized for failing to have adopted vocational regulations, see Staff of Subcomm. on Social Security of the House Comm. on Ways and Means, 94th Cong., 2d Sess., Disability Insurance-Legislative Issue Paper 17 (Comm. Print 1976); (e) On a number of occasions, the Chairman of the Subcommittee on Social Security of the House Committee on Ways and Means introduced legislation that would have required the Department to promulgate medical-vocational regulations, see H.R. 15630, 94th Cong., 2d Sess. (1976); H.R. 8076, 95th Cong., 1st Sess. (1977); (f) This legislation was not enacted, in view of the Department's promulgation of the regulations challenged here, see Subcomm. on Social Security of the House Comm. on Ways and Means, 95th Cong., 2d Sess., Proposed Disability Insurance Amendments of 1978 (Comm. Print 1978) (recommending that no change be made in the Act's definition of disability pending a determination as to the operation of the new regulations); and (g) Congress as of yet has not enacted legislation overturning the regulations
 Despite this impressive array of material-which, we note, appellees do not challenge as misleading or unrepresentative-we hesitate to ground our holding on the existence of such a "legislative history." While the Department may be able to demonstrate that its actions are in accord with the will of recent Congresses, it cannot establish-at least from the above-mentioned records-that the medical-vocational regulations were envisioned or implicitly authorized by the Congress that originally approved the disability provisions of the Act. The Supreme Court recently has warned that
 isolated statements by individual Members of Congress or its committees, all made after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of enactment.... Nor do these comments, none of which represents the will of Congress as a whole, constitute subsequent 'legislation' such as this Court might weigh in construing the meaning of an earlier enactment.
 Southeastern Community College v. Davis, 442 U.S. 397, 411 n.11, 99 S.Ct. 2361, 2370 n.11, 60 L.Ed.2d 980 (1979) (citations omitted); see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 117, 118 n.13, 119-20, 100 S.Ct. 2051, 2060, 2061 n.13 2062, 64 L.Ed.2d 766 (1980). In view of this interdiction on the expansive use of congressional authorities, we do not contend that the "legislative history" affirmatively authorizes the Department's medical-vocational regulations. Nonetheless, we note that we have discovered nothing in the legislative records which indicates that those regulations are somehow inconsistent with the Act.
 
 
 [25]
 The Second Circuit, in a recent decision, followed a similar path in overturning a determination of non-disability made in accord with the regulations. The court noted that one of its precedents, Bastien v. Califano, 572 F.2d 908 (2d Cir. 1978) required that the Secretary show the existence of specific types of jobs capable of being filled by a particular claimant before arriving at a finding of "not disabled." Because the ALJ, in applying the medical-vocational regulations, ignored the Bastien mandate and "fail(ed) to show suitable available alternative jobs" for the applicant, the court held that the ALJ's decision was not supported by substantial evidence. Campbell v. Secretary of Dep't of Health & Human Servs., 665 F.2d 48, 54 (2d Cir. 1981); see also Decker v. Harris, 647 F.2d 291 (2d Cir. 1981)
 
 
 [26]
 The Fifth Circuit, in upholding a determination of non-disability based on the regulations at issue here, distinguished Johnson v. Harris, 612 F.2d 993 (5th Cir. 1980), a case similar to Dobrowolsky, as follows:
 (I)n Johnson we remanded for further hearing because of insufficient questioning by the ALJ of the vocational expert; the ALJ asked the vocational expert what sedentary jobs the claimant could do, given his qualifications, but " 'disregarding completely any mental or physical impairment which the claimant may have or be found to have.' " In the present case, the ALJ determined that Salinas's impairments were of sufficient severity so as to limit Salinas to light work-only then did the ALJ consult the vocational regulations. Because Salinas's physical impairments were considered in determining whether he could engage in substantially gainful employment, this case is distinguishable from Johnson.
 Salinas v. Schweiker, 662 F.2d 345, 349 (5th Cir. 1981) (citation omitted).
 
 
 [27]
 See J. Mashaw, supra, at 80-82, arguing that: a) administrative notice should be used instead of vocational testimony; b) past judicial decisions can be, but need not be, read as limiting the availability of the official notice technique; c) the official notice approach has been employed with success in other agencies, such as the Federal Trade Commission; d) greater reliance on administrative notice would lead to cost reductions; and e) "(o)fficial notice would contribute to the fairness of the decision-making process by specifying precisely what findings the ALJ is relying upon in concluding that the claimant is able to engage in substantial gainful employment. This would permit a more focused response than is likely with respect to (vocational) testimony in the form it is now offered."