Wallis D. CORNELLA

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services.

No. CIV79–5041.

United States District Court,
D. South Dakota.

Aug. 13, 1982.

Mark Falk, Black Hills Legal Services, Rapid City, S. D., for plaintiff.

Philip N. Hogen, U. S. Atty., Sioux Falls, S. D., for defendant.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

### I.

Wallis D. Cornella (Plaintiff) brought this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Secretary of Health and Human Services (Secretary) denying Social Security benefits for the period August 13, 1977 to February 19, 1979. This case is before the Court on review for the second time on renewed cross-motions for summary judgment.

Plaintiff filed two applications for disability benefits with the Secretary, both of which were denied. The second application was filed on November 2, 1977, alleging a disability onset date of August 13, 1977, because of a bad back and bad hearing. This application was denied initially and upon reconsideration. Following an administrative hearing, the Administrative Law Judge (ALJ # 1) refused the claim. The Appeals Council of the Department of Health and Human Services declined review of the decision, rendering it a final decision of the Secretary. 20 C.F.R. § 404.-981 (1981).

Plaintiff brought action before this Court for judicial review of the Secretary's final decision. 42 U.S.C. § 405(g) (1976). The Court remanded the case by order dated February 7, 1980, to the Secretary for further development of the record. Thereafter, the Appeals Council remanded the case

to a new Administrative Law Judge (ALJ # 2).

After the October 9, 1980 remand hearing, the ALJ # 2 issued a recommended decision on March 27, 1981, finding Plaintiff to be under a disability beginning June 30, 1979. The Appeals Council modified this decision determining that Plaintiff was entitled to a period of disability commencing February 19, 1979, and to disability insurance benefits. Plaintiff has appealed to this Court seeking review of the Secretary's final decision, alleging that the disability onset date is August 13, 1977, rather than February 19, 1979.

## II.

This Court's task on review is to determine whether the Secretary's decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g) (1976); *Lanes v. Harris,* 656 F.2d 285, 287 (8th Cir. 1981). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). This Court is fully aware that "conflicting evidence on the record does not mean that the district court ... should serve as a rubber stamp for the Secretary's decisions." *Brand v. Secretary of the Dept. of Health, Education and Welfare,* 623 F.2d 523, 527 (8th Cir. 1980). Appellate review is more than a search for the existence of substantial evidence supporting the Secretary's findings. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1959).

## III.

The ALJ # 2 made the following recommended findings, affirmed and adopted by the Appeals Council with the exception of the disability onset date:

1. The claimant has no single impairment or combination of impairments which meet or equal the listings and has not engaged in any substantial gainful activity since at least January 1979.

2. Prior to January of 1979 the claimant was engaging in activities which demonstrated a capacity to perform substantial gainful activity at least on a part-time basis and that the primary reason such activities were not gainful were lack of profit due to improper equipment.

3. The claimant has a limited education and work experience primarily as a truck driver and equipment operator.

4. The claimant suffers from severe medical impairments in the form of pain in the lumbosacral area and the results of an active peptic ulcer.

5. The claimant has a minor impairment in the sense of a bilateral hearing loss which would not seriously effect [sic] the ability to perform functional activities.

6. The claimant suffers from a stress and tension disorder which aggravates the pain and was probably a causative factor in the ulcer situation.

7. The claimant last met the special earnings requirements on March 31, 1980.

8. Beginning June 30, 1979, the claimant no longer had the residual functional capacity to perform any substantial gainful activity.

9. That for all months prior to February 1979 the claimant was a younger worker and that on February 19, 1979 he became 50 years of age and was therefore closely approaching advanced age.

10. That beginning June 30, 1979 the claimant was under a disability as alleged but that there was no period of 12 consecutive calender [sic] months prior to such date when he

lacked the residual functional capacity to engage in substantial gainful activity of at least a sedentary nature.

Plaintiff objected to the June 30, 1979, disability onset date arguing that he has been disabled since August 13, 1977.

### IV.

The Appeals Council modified the ALJ # 2's recommended decision because the Council applied the Medical-Vocational Guidelines in Appendix 2 of the Secretary's Regulations, codified in Subpart P of Part 404 of Chapter III of Title 20 of the Code of Federal Regulations, 20 C.F.R. §§ 404.1501 et seq. (1981).[1] The Medical-Vocational Guidelines in Appendix 2, sometimes referred to as "the grid," required mechanical application of Table 1 to determine whether or not Plaintiff was disabled. The Appeals Council applied Table 1 because Plaintiff apparently met the statutory criteria (residual functional capacity, age, education, and work experience) set out in the Rules of Table 1. 20 C.F.R. Appendix 2, § 200.00(a) (1981). See McCoy v. Schweiker, 683 F.2d 1138 at 1146–1147 (8th Cir. 1982). Such application determined Plaintiff to be disabled on February 19, 1979, the date of his fiftieth birthday. 20 C.F.R. Appendix 2, Table 1, Rule 201.10 (1981).[2] Similarly, such application determined Plaintiff not to be disabled prior to February 19, 1979 (i.e., between August 13, 1977 and February 19, 1979) because of a smaller age factor. Id. Rule 201.19.[3] In order to use and apply Table 1 of Appendix 2 and find Plaintiff not disabled prior to February 19, 1979, the Appeals Council necessarily utilized the ALJ # 2's recommended findings,[4] supra, regarding Plaintiff's age, education, work experience and residual functional capacity (RFC) of at least a sedentary nature.

### V.

### A.

The record in this case is voluminous, but an extensive study of the facts is necessary for a proper review of the record as a whole. In general, Plaintiff, of limited education (11th grade) but literate, was born on February 19, 1929. He has been variously employed as a truck driver and heavy equipment operator throughout his life.

Plaintiff has a long history of medical problems dating back to when he was a teenager. In an effort to provide a comprehensive review of the Secretary's decision, this Court deems it necessary to begin its factual examination at that time in Plaintiff's life.

As a teenager Plaintiff fell out of a moving car and injured his back. Without the

---

1. Although Plaintiff does not attack the validity of the Regulations, we note that the Eighth Circuit Court of Appeals has upheld them.

| RULE | AGE | EDUCATION | PREVIOUS WORK EXPERIENCE | DECISION |
|---|---|---|---|---|
| 201.10 | Closely approaching advanced age | Limited or less | Skilled or semi-skilled —skills not transferable | Disabled |

"Closely approaching advanced age" is defined in 20 C.F.R. § 404.1563(c) as between the ages of 50 and 54. "Education" is defined in 20

| RULE | AGE | EDUCATION | PREVIOUS WORK EXPERIENCE | DECISION |
|---|---|---|---|---|
| 201.19 | Younger individual age 45–49 | Limited or less | Skilled or semi-skilled —skills not transferable | Not disabled |

4. Recommended Findings Nos. 1–10, Supplemental Transcript (S.T.), p. 216.

McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc).

2. Rule 201.10 provides:

C.F.R. § 404.1564. "Previous work experience" is defined in 20 C.F.R. § 404.1565.

3. Rule 201.19 provides:

benefit of a physician, he was confined to bed for approximately one and one-half months, only to discover some twenty years later that he had broken his back. In 1956 a tree fell on Plaintiff while he was operating a caterpillar. X-rays at the time showed that he had rebroken a bone in his lower back and that he had broken off three transverse processes in the upper spine. Plaintiff was restricted to traction for one month and required over six months of physical therapy.

In 1972, while unloading a truck, Plaintiff reinjured his back when he developed severe muscle spasms in the lower back area requiring hospitalization. As a direct result, Plaintiff underwent a decompressive laminectomy (back surgery), but due to low blood pressure, no lumbar fusion was performed. From 1972 to 1975, Plaintiff was unable to work and received Workmen's Compensation benefits. In 1974 Plaintiff's surgeon, Dr. Gerald P. Gredler, estimated that Plaintiff suffered from 25 percent permanent partial disability. From 1975 to August 13, 1977, Plaintiff engaged in his truck driving occupation, but met continued difficulty because of physical limitations and accompanying pain.

On August 13, 1977, while attempting to chain down a truckload of log wood, Plaintiff again experienced severe muscle spasms. He did no work from August 13, 1977 to March, 1978. The record is not clear regarding Plaintiff's work activities from March, 1978 to September, 1978, but it does show that he either attempted to or did engage in some truck-driving work activity. The record further indicates some minor activities in a volunteer capacity, including electrical and plumbing work and occasionally driving for the senior citizens' meals-on-wheels program. From October, 1978 to February 19, 1979, Plaintiff's work activity was negligible.

B.

At Plaintiff's first administrative hearing held on November 28, 1978, he was accompanied by his brother, Ronald Cornella. Plaintiff testified that he did some truck driving since August 13, 1977 to make groceries, but that he couldn't stand much of it.[5] He further testified that sometimes he would be able to work three or four hours a day and that he averaged fifteen-eighteen hours of work per week in August and September, 1978. Previous to that time, though, Plaintiff did not think he averaged that because there were weeks and weeks at a time when he did nothing. Plaintiff stated that he performed minor volunteer activities such as putting in electrical switches and driving for the senior citizens' meals-on-wheels program. Plaintiff did, however, send a letter to the ALJ # 1 after the hearing saying that he thought his total work from March 15, 1978 to December 5, 1978 was about 600 hours.

Plaintiff further testified that he could lift nothing, including the tarps and chains on trucks; that constant low back pain wakes him in the middle of the night and prevents him from hunting, fishing and gardening; that he does no more than necessary, including walking, because he hurts so bad; that he gets many headaches, increasing in severity since 1972; that he felt compelled to work on part-time jobs in order to provide food for his family; that he wears a back brace constantly, including when he sleeps; and that he takes two-hour naps during the day.

Plaintiff attended this hearing on crutches; he was using a cervical traction kit to stretch his neck muscles. On the date of this first hearing, Plaintiff was taking numerous types of prescribed medications and pills designed to relieve pain and relax muscles.[6]

---

**5.** Plaintiff's earnings record, dated May 12, 1980, shows earnings as follows:

| | | | |
|---|---|---|---|
| 1972 | $1,836.64 | 1976 | $2,042.10 |
| 1973 | 6,062.82 | 1977 | 784.36 |
| 1974 | 2,394.08 | 1978 | ------ |
| 1975 | 5,506.56 | 1979 | ------ |

**6.** On review of Plaintiff's entire medical record, it appears to this Court that one of the many

Plaintiff was treated both as an inpatient and an outpatient at the Veterans Administration Hospital in Fort Meade, South Dakota, at all times from November 4, 1978,[7] through the date of the first hearing. Plaintiff underwent a physical examination on November 4, 1978, and, subsequently, was hospitalized from November 5, 1977 to December 5, 1977. He was examined and treated as an outpatient numerous times thereafter.

## C.

■ . Dr. Stephen Maks, Plaintiff's attending and treating physician,[8] stated in a clinical report dated December 16, 1977, that the reason for Plaintiff's admission to the hospital was Plaintiff's hope for evaluation of a very bothersome, disabling, continuous low backache of about three and one-half months duration, but episodic for many years.[9] Dr. Maks indicated Plaintiff has had episodic low backache since he was a teenager and the attacks may last a few days or a few months. Dr. Maks asserted that Plaintiff appeared healthy but did have obvious pain; that he was hardly able to stand or walk and it was painful to sit or lie down; that there was diffuse muscle spasm and lumbar tenderness, limiting lumbar movement markedly in all directions; that straight leg raising was moderately limited bilaterally because of lower back pain; that there was permanent moderate reduced lumbar lordosis (abnormality of the spine); and that low back X-rays revealed moderate degenerative changes of the L5–S1 and L4–L5 disks with some narrowing of both sacroiliac joints. Dr. Maks concluded that Plaintiff was temporarily unemployable because of continued low back distress, aggravated by any physical activity. Dr. Maks felt that the prognosis was good with patient's care and proper medication.

Dr. Maks also recognized Plaintiff suffered from moderately severe bilateral nerve hearing loss.[10] This condition was later improved by use of functional hearing aids.

Dr. Maks' next contact with Plaintiff on January 16, 1978, showed that Plaintiff's back was still bad and that his left leg gave out at times. The examination again revealed diffuse tenderness of the lumbar spine. Dr. Maks felt, however, that Plaintiff was employable if he could obtain work not aggravating to low back strain.

Over the course of the next few months, Plaintiff was treated continuously for backache, neckache, and muscle spasms. On April 4, 1978, Dr. George F. Wood, Jr., a radiologist, viewed Plaintiff's spinal X-rays and issued his radiographic report. When compared with studies of X-rays taken on March 14, 1977, Dr. Wood believed that there was now a narrowing of the sixth cervical interspace associated with some spurring and osteophyte formation. He indicated there had been a change since the study a year ago and such change would

courses of continuing treatment included use of prescribed medications. Some of those used were Valium, Darvon, Moltrin, Escriptin, Napersin, and Tylenol # 3.

7. Plaintiff's wife, Arlene Cornella, testified that she tried to get her husband to go to the hospital sooner. She stated that he finally got so bad that he practically had to be carried to the hospital.

8. Case law requires that unless good cause is shown to the contrary, the administrative law judge must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of a claimant's treat-

ing physician. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

9. It is interesting to note that on March 14, 1977, five months prior to the alleged disability onset date in this appeal, Dr. W. J. Perry advised Plaintiff to modify his life style within the severe limitations of his back condition, avoiding if possible any bending, stooping or twisting types of activities.

10. On April 20, 1977, Dr. Bruce Allen examined Plaintiff regarding his alleged hearing problem. Dr. Allen reported a sensory neural depression of a severe degree. This Court is satisfied from the record, though, that hearing aids greatly improved Plaintiff's condition.

certainly suggest the possibility of disc degeneration and even herniation.[11]

On April 17, 1978, Dr. Dale E. Berkebile, an orthopedist, examined Plaintiff. Dr. Berkebile reported that Plaintiff walked without a limp or list and walked on his toes and heels without difficulty; that Plaintiff's range of motion of his back was somewhat limited with forward flexion of 70° and side flexion of 20°; that there was lumbar muscle spasm; and that lumbosacral spine X-rays were within normal limits as far as he was concerned. Dr. Berkebile concluded by stating he did not find anything physically wrong with Plaintiff to explain why he has the discomfort that he has.

On May 22, 1978, Dr. George C. Flora, a neurologist, performed a neurological examination on Plaintiff. Dr. Flora's examination revealed a normal mental status, no evidence of acute disc syndrome, and no sensory, motor, or reflex abnormalities.

Dr. Maks concluded, after further examination of Plaintiff in June, 1978, that Plaintiff was still unemployable because of orthopedic problems. He further asserted that Plaintiff should not do any heavy work, lifting, bouncing, long standing, gripping or pulling. The medical record quoted Dr. Maks on June 23, 1978, "Is there any potential rehabilitation?" The records further revealed that in August, 1978, Dr. Maks indicated Plaintiff could plan to work three or four hours daily driving truck, but no more than that.

For the remainder of 1978, Plaintiff was observed and treated on numerous occasions with medication, traction, and back supports. After similar observation and treatment in early 1979, Plaintiff was referred to a pain clinic in Minneapolis, Minnesota.

On March 14, 1979, Dr. Jack Drucker examined Plaintiff at the Pain Clinic. Dr. Drucker reported that Plaintiff had chronic back pain syndrome dating back to 1972 and intermittent limitation of his functional capacities. Plaintiff told Dr. Drucker that

during any thirty-day period, Plaintiff had fifteen days when he could function quite well. During the other fifteen days, Plaintiff stated that he had more intense pain and was sometimes unable to leave the house. Plaintiff also said that he could drive cars long distances and be active doing numerous types of volunteer activities in his home neighborhood.

Plaintiff continued treatment at the Veterans Administration Hospital in Fort Meade, South Dakota. In April, 1979, in addition to treatment already provided Plaintiff, an electric stimulator (TENS machine) was prescribed to help relieve pain. Similar treatment continued for the remainder of 1979.

Plaintiff developed a peptic ulcer in 1980, along with other physical problems, including prostate, bladder, and teeth problems. On May 28, 1980, Dr. Frank Buzzetta, a psychologist, examined Plaintiff at the request of the Department of Vocational Rehabilitation Disability Determination Services. Dr. Buzzetta found no indication of organic deficit or of a psychological problem.

Also on May 28, 1980, Dr. Donald Burnap performed a psychiatric evaluation of Plaintiff. Dr. Burnap found no evidence of any emotional or psychiatric problem. Although he completed a checklist captioned "residual functional capacity," indicating that Plaintiff suffered very few psychiatric restrictions, Dr. Burnap concluded his narrative report stating that it was reasonably safe to assume that the pain Plaintiff reports is in fact what he experiences.

On June 4, 1980, Dr. J. W. Freeman's physical examination revealed findings similar to those already reported. Dr. Freeman reasoned, however, that Plaintiff's prognosis must be considered very guarded given the longevity of his back pain.

D.

At the supplemental hearing (on remand) held October 9, 1980, Plaintiff was accom-

11. Another radiologist, Dr. H. O. Haugan, examined Plaintiff's spinal X-rays on October 21, 1977, and found no real change since March 14, 1977.

panied and represented by legal counsel. Plaintiff attempted to clarify his work activity from March to September 1978. He indicated that he did not average 18 hours during this time except in August and September. Plaintiff said he could not do much of the actual truck driving during this time; he had to hire it done because of his back condition.

Plaintiff further testified that he tried to drive truck in December 1978, but his back just folded up and would not operate any more; that he did no work in 1979; and that he tried to work once in 1980, but just could not take it.

Regarding his volunteer activities, Plaintiff testified that the electrical work he did was for friends and family and he probably did it four times in three years; that he did a small amount of plumbing work such as fixing faucets; that driving for the senior citizens' meals-on-wheels program was not on a regular basis and was for his mother and her friends when the roads became icy.

Regarding his physical condition, Plaintiff testified that he was in constant pain; that he could not lift anything; that he could stand for maybe 30 minutes before having to get off his feet; that he does not even try to walk more than a couple of blocks; that he does not even try bending; that it bothers him to sit and that both legs were numb and asleep at the hearing; that he was very uncomfortable while testifying; that he cannot sleep well at all; and that his back condition has gotten progressively worse over the last several years.

Plaintiff's wife, Arlene Cornella, testified that Plaintiff had not worked 18 hours a week from March to September, 1978; he just wanted to make a living for the family. She said that from what she saw, Plaintiff was constantly in pain; that it would hurt him to carry ten pounds; and that he couldn't pick up the tool box anymore.

Plaintiff's daughters, Glenda Cornella, Lisa Hancock and Rena Leason, all testified from their personal observations, seeing their father two to four times a week over the past three to five years. They said that he was in pain, that he could not lift or walk very far, and that he could not sit or stand long. Plaintiff's neighbor, Gladys Kerber, for the last five or six years, testified that she personally observed Plaintiff during this time. She felt that he was in pain. She said there were times when he could hardly get around. Plaintiff's mother, Florence Cornella, similarly testified that she observed Plaintiff was in pain.

Affidavits were submitted by Plaintiff's brother, Ronald Cornella, his son-in-law, Craig Leason, his daughter, Bonnie Vice, and his local minister, Rev. Sam Cushing. All affiants testified from their personal observations and experience that Plaintiff was in considerable pain and could not carry on a full-time job.

## VI.

It appears to this Court that in the past, the application of Social Security law in disability cases involving the Medical-Vocational Guidelines may have been somewhat confusing. After extensive study of the applicable statute,[12] the applicable regula-

---

12. 42 U.S.C. § 423 (1976). In pertinent part, 42 U.S.C. § 423(d) provides:

(d) Definition of disability. (1) The term "disability" means—
(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; ...
(2) For purposes of paragraph (1)(A)—
(A) an individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country. ...

tions,[13] and the recent Eighth Circuit Court of Appeals' definitive opinion in *McCoy v. Schweiker*, 683 F.2d 1138 (8th Cir. 1982), regarding the use of the Medical-Vocational Guidelines in disability cases, this Court now has a structured and analytical basis from which it will review the case at bar. Additionally, this Court deems it proper to follow the orderly and uniform framework for analysis and decision that the Guidelines sequentially fix for administrative law judges to follow. *See, McCoy v. Schweiker*, 683 F.2d 1138 at 1141, 1142 (8th Cir. 1982). The instant case is concerned only with the time period from August 13, 1977 to February 19, 1979, in which the Secretary determined no disability to exist.[14]

### A.

Our initial item of inquiry is whether Plaintiff was engaged in substantial gainful activity during this period. The ALJ # 2's Recommended Finding # 2 states that prior to January, 1979, Plaintiff was engaging in substantial gainful activity at least on a part-time basis. Accordingly, under the *McCoy* analysis for the period prior to January, 1979, no further examination by the ALJ # 2 was necessary because a finding of "not disabled" was directed. *Id.* This Court's review, therefore, simply would be limited to whether substantial evidence supports this finding. Upon further inspection, however, an apparent inconsistency immediately arises regarding the Appeals Council's approach to finding Plaintiff not disabled during this period.

█ The Appeals Council adopted and applied the ALJ # 2's further findings, relating to age, education, work experience

and RFC. To reach its conclusion that prior to February 19, 1979, no disability existed, the Appeals Council utilized the Medical-Vocational Guidelines. By using the Guidelines, the Council effectively found that Plaintiff was *not* engaged in substantial gainful activity in order to reach the stage of the *McCoy* analysis where age, education, work experience and RFC become relevant. *Id.* Because of this inconsistency and because the Appeals Council's decision is the Secretary's final decision in this case, 20 C.F.R. § 404.981 (1981), this Court must assume and conclude that Plaintiff was *not* engaging in substantial gainful activity from August 13, 1977 to February 19, 1979. *See, Torres v. Secretary of Health and Human Services*, 668 F.2d 67, 69 (1st Cir. 1981).

### B.

Because Plaintiff was not engaging in substantial gainful activity during this time, the next question is whether he was suffering from a severe impairment. In the ALJ # 2's Recommended Finding # 4, he states that Plaintiff suffers from severe medical impairments in the form of pain in the lumbosacral area and the results of an active peptic ulcer. Therefore, following similar *McCoy* analysis from above, the Appeals Council necessarily found that Plaintiff was suffering from a severe impairment during the time in question. *Id.*

█ At this point, the question becomes whether the severe impairment is one listed in 20 C.F.R. Appendix 1 to Subpart P. The ALJ # 2 found in Recommended Finding #. 1, adopted by the Appeals Council, that Plaintiff had no impairments listed in Appendix 1. Upon careful review of the rec-

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

(4) The Secretary shall by regulations prescribe the criteria for determining when services performed or earnings derived from services demonstrate an individual's ability to engage in substantial gainful activity.

(5) An individual shall not be considered to be under a disability unless he furnishes such

medical and other evidence of the existence thereof as the Secretary may require.

**13.** 20 C.F.R. § 404.1501 *et seq.* (1981).

**14.** The ALJ # 2 stated in his recommended decision on March 27, 1981 that upon his review of the testimony and medical evidence at the first hearing relating to the period prior to January, 1979, his findings and decision would have been substantially the same.

ord as a whole and of the listings in Appendix 1, this Court holds that substantial evidence supports this finding. See 20 C.F.R. Appendix 1 (1981).

The next inquiry is whether Plaintiff could perform relevant past work. Although no specific finding was made concerning this point the ALJ # 2 and Appeals Council did determine that Plaintiff retained the RFC for sedentary work. Again, under *McCoy*, this finding necessarily means that Plaintiff could not perform his past occupation from August 13, 1977 to February 19, 1979. *Id.; McCoy*, at 1141–1142. Moreover, the Government, in their brief at page 5, admits that Plaintiff could not return to his former job as a truck driver.

### C.

■ Our examination brings us to the issue of whether Plaintiff can engage in other jobs that exist in the national economy, despite the severe impairments preventing return to his previous work. In order to make this determination, the ALJ # 2 was required to ascertain Plaintiff's RFC, age, education, and work experience.[15] "If the ALJ's findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either "disabled" or "not disabled") directed by the relevant Rule or line of the applicable Table." *McCoy*, at 1142; e.g., *Cummins v. Schweiker*, 670 F.2d 81 (7th Cir. 1982).

The law is settled that a claimant has the burden of establishing the existence of his disability. *Lanes v. Harris*, 656 F.2d 285, 287 (8th Cir. 1981). But, once the claimant establishes that a disability precludes him from performing his past occupation because of a medically determinable ailment, the burden shifts to the Secretary to prove that there is some other substantial gainful activity that the claimant can perform. *Martin v. Harris*, 666 F.2d 1153, 1155 (8th Cir. 1981); *Stone v. Harris*, 657 F.2d 210, 211 (8th Cir. 1981); *Gilliam v. Califano*, 620 F.2d 691, 693 (8th Cir. 1980).

■ In the instant case, the burden of proof shifted to the Secretary to prove with substantial evidence that Plaintiff had the RFC to do other kinds of work, and that his RFC, age, education, and work experience fit him to do some job that exists in the national economy. *McCoy*, at 1146–1147. Assuming that the Tables in Appendix 2 apply in this case, such application *ipso facto* determines that there are jobs in the national economy that Plaintiff can do. *Id.* at 1140, 1146–1147, 20 C.F.R. Appendix 2, § 200.00(b) (1981) (Administrative notice taken). The Secretary's burden is met. But, even so, the Secretary must still show that Plaintiff is a member of one of the groups characterized in the Tables and that Plaintiff has the requisite RFC. *McCoy*, at 1147.

■ On the other hand, assuming the Tables do not apply, i.e., Plaintiff does not fit the criteria exactly, see, e.g., *Santise v. Schweiker*, 676 F.2d 925 at 935 (3rd Cir., 1982), the Secretary must call a vocational expert to determine if jobs exist in the national economy that Plaintiff can do. *McCoy*, at 1146. In such a case, the tables are only used as a guide to the disability determination. *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 528 (6th Cir. 1981).

With the above discussion as a foundation, this Court must decide whether, on the record before it, the Tables, as interpreted and explained in the *McCoy* opinion, were in fact applicable and properly applied by the Appeals Council. See, *McCoy*, at 1149. The precise question in determining the applicability of the Tables, therefore, is whether the ALJ # 2's Findings, adopted by the Appeals Council, as to the underlying facts—age, education, work experience,

---

15. Age, education, and work experience are vocational factors, as opposed to RFC, which is a medical factor. "The criteria of age, education, and work experience are relevant because the statute specifies them in defining disability, 42 U.S.C. § 423(d)(2)(A)." *McCoy v. Schweiker*, 683 F.2d 1138 at 1142 (8th Cir. 1982).

and RFC to perform sedentary work—are supported by substantial evidence on the record as a whole.

## VII.

### A.

Although age, education, and work experience are less complex than RFC, they are not to be passed over lightly. " 'Age' refers to how old you are (your chronological age) and the extent to which your age affects your ability to adapt to a new work situation and to do work in competition with others." 20 C.F.R. § 404.1563(a) (1981).

On February 19, 1979, Plaintiff reached age fifty. At that time, under the regulations, he was considered to be a "person approaching advanced age" (age 50–54). *Id.* § 404.1563(c). Prior to that time, the period from August 13, 1977 to February 19, 1979, he was considered to be a "younger person" (age 45–49). *Id.* § 404.1563(b). In this age category, the Secretary does "not consider that your age will seriously affect your ability to adapt to a new work situation." *Id.* Even though these age categories are not mechanically applied in a borderline situation, *Id.* § 404.1563(a), this Court discovered no evidence in the record that shows Plaintiff's age in any way affected his ability to adapt to a new work situation or to do work in competition with others. The Court therefore holds that the age criterion used in Table 1 by the Secretary is supported by substantial evidence.

### B.

" 'Education' is primarily used to mean formal schooling or other training which contributes to your ability to meet vocational requirements." *Id.* § 404.1564(a). Although "the numerical grade level that you completed in school may not represent your actual educational abilities . . . , if there is no other evidence to contradict it, [the Secretary] will use your numerical grade level to determine your educational abilities." *Id.* § 404.1564(b).

In the case at bar, Plaintiff completed the eleventh grade of formal schooling.

Plaintiff therefore was considered to be in the "limited education" (7th grade through 11th grade) category. *Id.* § 404.1564(b)(3). The record discloses no evidence that would contradict this numerical grade level. Hence, the education criterion is supported by substantial evidence.

" 'Work experience' means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do." *Id.* § 404.1565(a). It "applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity." *Id.*

Plaintiff's work experience generally included driving a truck and operating heavy equipment. Based on this experience, Plaintiff's work background was considered "skilled or unskilled—skills not transferable." *Id.* § 404.1568(b), (c), (d)(3). This finding is similarly supported by the record.

### D.

The more complicated of the criteria is RFC. Because a claimant's impairments may cause physical and mental limitations that affect what he can do in a work setting, RFC is defined as "what [a claimant] can still do despite [his] limitations." *Id.* § 404.1545(a). RFC may include subjective *descriptions* of limitations beyond the symptoms important in the treatment and diagnosis of the medical condition. *Id.* *Observations* of limitations during actual work activities, as well as during formal medical examinations, may also be used. *Id.* RFC is a medical assessment of a claimant's remaining capacity for work using these descriptions, observations, and his medical record. This assessment enables the Secretary to determine the extent that an impairment prohibits the performance of particular work activities; it is "not a decision on whether [a claimant is] disabled, but is used as the *basis* for determining the particular types of work [a claimant] may be able to do despite [his] impairment." *Id.* (Emphasis added.)

"RFC is defined wholly in terms of the physical ability to perform certain *exertional* tasks." *McCoy*, at 1148 (emphasis added). "To determine ... physical exertion requirements ... [the Secretary] classif[ies] jobs as 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy.'" 20 C.F.R. § 404.1567 (1981). In the instant case, the Secretary found that prior to February 19, 1979, Plaintiff had the RFC to engage in substantial gainful activity of at least a sedentary nature. Sedentary work involves:

> [L]ifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *Id.* § 404.1567(a).

Before further reviewing this case, this Court must examine the relationship of nonexertional impairments and RFC in order to provide a comprehensive discussion of the Medical-Vocational Guidelines used here.

## VIII.

### A.

■ "Some medically determinable impairments, ... do not limit physical exertion." *Id.* § 404.1545(d). Examples of these nonexertional types of impairments include skin impairments, epilepsy, impairments of vision, hearing or other senses, postural and manipulative limitations, environmental restrictions, psychiatric impairments, and chronic alcoholism. *Id.* § 404.-1545(d) and Appendix 2, § 200.00(e); *McCoy*, at 1148–1149. In addition,

> [p]ain may be a nonexertional factor to be considered in combination with exertional limitations as well as a separate and independent ground for disability. Where pain is considered as a separate ground for disability, of course, it must be severe enough to prevent the claimant

from engaging in *any* substantial gainful employment. Where pain is considered in combination with exertional limitations, however, it need only be found significant enough to prevent the claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies.

*Gagnon v. Secretary of Health and Human Services*, 666 F.2d 662, 666 n. 8 (1st Cir. 1981) (emphasis in original). The Secretary must consider both exertional and nonexertional impairments in deciding a claimant's RFC. 20 C.F.R. § 404.1545(d) (1981).

The Secretary's regulations require that if a claimant "has solely a nonexertional type of impairment, ... [the] rules [in the Tables of Appendix 2] do not direct factual conclusions of disabled or not disabled for [this] individual [ ] .... " *Id.* Appendix 2, § 200.00(e)(1). If, on the other hand, a claimant has a combination of exertional and nonexertional impairments, the Tables are first considered to determine whether the claimant is entitled to a finding of disabled based on exertional impairments alone. *Id.* § 200.00(e)(2); *McCoy*, at 1148. If such a finding is not directed, "the rule(s) [in the Guidelines] reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." *Id.* In these cases where the Rules in the Guidelines do not apply, "full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate section of the regulations." *Id.* Appendix 2, § 200.00(a) and (e)(2).

### B.

■ In the case at bar, the Secretary found that Plaintiff's characteristics fit the requirements of the Guidelines and its Rules exactly. But in fact they did not, because Plaintiff suffered from a severe medical impairment in the form of pain in

the lumbosacral area.[16] The ALJ # 2 made this specific finding in his Recommended Finding # 4. Furthermore, the ALJ # 2 explicitly asserted early in his recommended decision that "[t]he primary basis for the recommended findings in this matter arrives from nonexertional impairment as opposed to exertional ones." Supplemental Transcript, p. 213. In other words, the ALJ # 2 fully recognized the existence of Plaintiff's pain as a nonexertional impairment. The Appeals Council also acknowledged Plaintiff's pain, but in terms of degree. This Court holds, therefore, that Plaintiff's impairment in the form of pain is "nonexertional" and not encompassed in the definition of ability to do sedentary work.[17] *Gagnon*, 666 F.2d at 666 n. 8. The Secretary recognizes that in cases where there is a nonexertional impairment, the administrative law judge must go beyond the Guidelines. *Cummins*, 670 F.2d at 84. Therefore, where Plaintiff's nonexertional limitation related to the presence of severe impairing pain, which was recognized by the Secretary, it was error to apply the Tables mechanically to find nondisability. *Broz v. Schweiker*, 677 F.2d 1351, 1356 (11th Cir. 1982); *Roberts v. Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981). Because Plaintiff's characteristics did not identically match the description in the Tables, the Tables can only be used to provide guidance for decisionmaking; they cannot be controlling. *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 528 (6th Cir. 1982); 20 C.F.R. Appendix 2, § 200.00(d) (1981). Moreover, "recourse must be had to other evidence than the Tables in Appendix 2 alone to conclude whether [Plaintiff] is capable of performing alternative work available in the national economy." *Roberts*, 667 F.2d at 1145.

## IX.

Because Plaintiff has a nonexertional impairment and because the Guidelines cannot be mechanically applied, "all the pre-existing requirements of case law, including the customary insistence on the use of vocational experts, retain their full vigor." *McCoy*, at 1146. Dr. William V. Tucker, a vocational expert, testified in the instant case. The ALJ # 2 correctly concluded that Plaintiff could not perform his former job. The question, therefore, is whether the Secretary met his burden to establish that there was work available in the national economy that Plaintiff could perform in his disabled condition. Even assuming, without deciding, that substantial evidence supports the Secretary's finding that Plaintiff had the RFC to perform sedentary work, remembering that RFC is not a disability decision but only the basis for determining the particular types of work Plaintiff might be able to do despite his impairments, this Court holds that the Secretary has not met his burden.

Plaintiff argues that the vocational expert's conclusion that there were specific jobs in the national economy that Plaintiff could perform was based on an improper hypothetical question posed to the expert. The ALJ # 2 concluded from the medical evidence and his observations that Plaintiff retained the physical capacity to perform sedentary work activity. Assuming this finding to be correct, when the ALJ # 2 asked the expert the first generalized hypothetical question, he assumed Plaintiff had this capacity without alluding to any other specific limitations. The ALJ # 2 did not relate with precision the job capacity and opportunity to the physical impairments of Plaintiff. *Daniels v. Mathews*, 567 F.2d

16. Although the ALJ # 1's decision is vacated, it is noted that he also recognized Plaintiff's impairments in the form of low back pain and hearing loss.

17. "The Guidelines apparently assume that the sole limitation on a claimant's ability to seek jobs in the national economy is lack of strength, given the claimant's age, education, and work experience. Where a claimant has non-strength limitations, therefore, the Guidelines do not accurately reflect what jobs would or would not be available. In cases where non-strength limitations are found, therefore, the Secretary must carry his burden of proving the availability of jobs in the national economy by other means." *Gagnon v. Secretary of Health and Human Services*, 666 F.2d 662, 665 n. 6 (1st Cir. 1981).

845, 848 (8th Cir. 1977). The type of hypothetical question posed here was defective and therefore the response can not constitute substantial evidence. *McGhee v. Harris*, 683 F.2d 256 (8th Cir. 1982); *Gilliam v. Califano*, 620 F.2d 691, 693–94 (8th Cir. 1980); *Stephens v. Secretary of HEW*, 603 F.2d 36, 41 (8th Cir. 1979).

The vocational expert's testimony was fatally deficient because this first hypothetical question did not clearly indicate Plaintiff's particular individual disabilities and did not set out all of Plaintiff's impairments. *McGhee*, 683 F.2d at 259; *Gilliam*, 620 F.2d at 693–94. At a minimum, this hypothetical question should have included a reference to Plaintiff's back condition, limitations on his ability to bend, stoop, sit or stand for prolonged periods, and his constant pain. *Stephens*, 603 F.2d at 41.

Ironically, as in the *Gilliam* case, the fatal defect in such a hypothetical question is well illustrated here by the discrepancy between the vocational expert's answer to the ALJ # 2's first hypothetical question and the expert's answers to the ALJ # 2's subsequent hypothetical questions. When the ALJ # 2 asked a second hypothetical question setting out the functional restrictions reported by Plaintiff, the vocational expert readily answered that it probably would *not* leave any number of jobs within the sedentary skill level. In fact, when the ALJ # 2 extended the functional limitations in a third hypothetical question, the vocational expert replied that his previous answer would not be modified to any significant degree. Moreover, when Plaintiff's counsel reasked on cross-examination the ALJ # 2's third hypothetical question, which included Plaintiff's reported limitations, the vocational expert reaffirmed his previous conclusion. The expert agreed that with the assumptions propounded in the third hypothetical question, there was not a significant number of jobs available in the national economy.

█ If this vocational testimony is to constitute substantial evidence that there are no jobs available in the national economy that Plaintiff could perform, Plaintiff's

allegations of pain and functional limitations must be credible and supported by the record. The ALJ # 2 made no explicit finding as to credibility, but in fact did find a severe impairment in the form of pain. At the first hearing, the ALJ # 1 did make an explicit credibility finding against Plaintiff. Considering these factors together, this Court must assume that the ALJ # 2 found Plaintiff's allegations of pain credible. *See, Andrews v. Schweiker*, 680 F.2d 559 (8th Cir. 1982) (administrative law judge must make explicit credibility finding); *Northcutt v. Califano*, 581 F.2d 164 (8th Cir. 1978). The medical evidence taken as a whole supports this assumption. There was no evidence that even hinted that Plaintiff was exaggerating his pain or that he was a malingerer. *Cf. Roberts v. Schweiker*, 682 F.2d 743 (8th Cir. 1982) (record supported ALJ's explicit credibility finding against claimant). Moreover, Plaintiff's family and friends provided ample corroboration from their personal observations of Plaintiff, contrary to the ALJ # 2's opinion. This Court recognizes that the evidence showing Plaintiff's work activity is indeed conflicting and may well lean on the side of showing Plaintiff's ability to work. Nonetheless, when compared with the record as a whole, it does not constitute substantial evidence.

Accordingly, when the record is viewed as a whole, including the long history of Plaintiff's medical problems, Plaintiff's deteriorating condition, his work activities, the credibility afforded Plaintiff's allegations of pain, the overall medical evidence, and the testimony given by the vocational expert, there is not substantial evidence to support the Secretary's denial of disability benefits from August 13, 1977 to February 19, 1979. This Court therefore reverses the Secretary's decision and remands this case with directions to grant summary judgment for Plaintiff.