**Clyde R. KNIGHT, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of Social Security,[1] Defendant.**

**No. CIV.A.00–581–SLR.**

United States District Court, D. Delaware.

March 25, 2002.

---

**1.** Jo Anne Barnhart became the Commissioner of Social Security, effective November 14, 2001, to succeed Acting Commissioner Larry G. Massanari, who succeeded Commissioner Kenneth S. Apfel. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne Barnhart is automatically substituted as the defendant in this action.

Timothy A. Reisinger, Esquire, Dover, DE, for Plaintiff.

Colm F. Connolly, United States Attorney and Judith M. Kinney, Assistant United States Attorney, United States Attorney's Office, Wilmington, DE, for Defendant. Of Counsel: James A. Winn, Regional Chief Counsel and Nicole A. Appalucci, Assistant Regional Counsel, Social Security Administration, Philadelphia, PA.

**2.** Plaintiff has a long history of mental illness and substance abuse. In September 1977, he filed an application for supplemental security income and disability insurance benefits based on mental illness and was awarded a period of disability from July 1977 through April 1988. (D.I. 12 at 10) Plaintiff testified

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Clyde R. Knight filed this action against Jo Anne Barnhart, Commissioner of Social Security ("Commissioner") on June 15, 2000. (D.I.3) Plaintiff seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of a decision by the Commissioner denying his claim for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f. Currently before the court are the parties' cross-motions for summary judgment. (D.I.15, 17) For the following reasons, the court shall grant defendant's motion and deny plaintiff's motion.

## II. BACKGROUND

### A. Procedural History

On February 10, 1997, plaintiff filed an application for supplemental security income and disability insurance benefits due to memory problems, anxiety, depression and schizophrenia, alleging an onset date of December 30, 1996.[2] (D.I. 12 at 10) Plaintiff's claim was denied both initially and upon reconsideration. (*Id.*) Plaintiff requested and subsequently received a hearing before an administrative law judge ("ALJ"), held on October 6, 1998.[3] (*Id.* at 23, 35) On December 11, 1998, the ALJ issued a decision denying plaintiff's claim. In considering the entire record, the ALJ found the following:

that he voluntarily ended his benefits in 1988 because he wanted to return to work. (*Id.* at 51)

**3.** An independent vocational expert was present at the hearing, but did not testify. (D.I. 12 at 39)

1. The claimant met the disability insured status requirements of the Act on December 30, 1996, the date the claimant stated he became unable to work, and has acquired sufficient quarters of coverage to remain insured through December 31, 2000.

2. The claimant has not engaged in substantial gainful activity since December 30, 1996.

3. The medical evidence establishes that the claimant has paranoid schizophrenia and polysubstance abuse, impairments which are severe but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible.[4]

5. The claimant retains the residual functional capacity to perform routine, simple, low stress work.[5]

6. In his past work as janitor, farmhand, or dishwasher, as generally performed in the national economy, the claimant was not required to perform complex, stressful work.

7. The claimant's past relevant work as janitor, farmhand, or dishwasher did not require the performance of work functions precluded by his medically determinable impairments.

8. The claimant's impairments do not prevent him from performing his past relevant work.

9. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision.

(*Id.* at 15–16) In order to arrive at his decision, the ALJ completed a Psychiatric Review Technique Form, in which he evaluated plaintiff's impairments under Listings 12.03 (Schizophrenic, Paranoid and other Psychotic Disorders) and 12.09 (Substance Addiction Disorders). (*Id.* at 18) The ALJ noted the presence of delusions or hallucinations, but concluded that plaintiff's impairments resulted in only a slight restriction of his daily activities and moderate difficulty in maintaining social functioning. (*Id.* at 19–20) Additionally, the ALJ found that plaintiff's impairments caused him to often experience deficiencies of concentration, persistence or pace and resulted in one or two episodes of deterio-

---

**4.** The ALJ elaborated:

> Mr. Knight's complaints and allegations concerning his condition and perceived limitations are not fully consistent with incapacitating disability.
>
> . . . . .
>
> The [ALJ] finds that the claimant is not credible as to his drinking. The claimant's record shows that on different dates he gave different periods when he claimed he was not drinking. His record also includes [a] criminal record of abuse of minors with alcohol and sex, which appears inconsistent with the claimant's allegation of disability.

(D.I. 12 at 14)

**5.** The ALJ opined:

> Although the undersigned concludes that the claimant has medically determinable impairments which cause him limitations, the evidence does not support a finding that the claimant's limitations are so severe as to preclude all work related activities. Although the claimant had an unkempt appearance and he has been assessed as having low average intelligence, these conditions were present when he worked in the past. Furthermore, the record shows that the claimant left his last job simply because he was not interested in working, not because of any medical limitations. In addition, the claimant has admitted to examining physicians that his condition is improving with medications.
>
> The undersigned finds that the claimant has significant non-exertional limitations which interfere with his ability to work. However, the evidence supports a finding that he is able to perform routine, simple, low stress work.

(D.I. 12 at 14–15)

ration or decompensation in work or a work-like setting. (*Id.* at 20)

On March 31, 2000, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (*Id.* at 3–4) Plaintiff now seeks review before this court pursuant to 42 U.S.C. § 405(g).[6]

## B. Facts Evinced at the Administrative Law Hearing

Plaintiff was born on May 16, 1941. (*Id.* at 137) He is twice divorced with several children who live with their mothers. (*Id.* at 123, 174) Plaintiff lives in a trailer with a female roommate/girlfriend, with whom he shares rent. (*Id.* at 39–40, 114) Plaintiff completed formal schooling through the eleventh grade and testified that he has problems reading and writing. (*Id.* at 41)

Since 1988, plaintiff has worked in a variety of positions, including dishwasher, custodian, gas pumper, and cleaner of horse stalls. (*Id.* at 43–46) His longest job was for about five years with Rose's department store doing "house keeping" and "chasing down carts." (*Id.* at 59) Plaintiff was fired from his job of two years at the Lone Star restaurant for allegedly "missing time." (*Id.* at 46) Plaintiff was terminated after five or six months as a dishwasher with the Olive Garden restaurant also for missing work. (*Id.* at 47) He was let go after one year at Carl King gas station for "medical reasons." (*Id.*) Specifically, plaintiff alleges that he suffered a seizure at work and the gas station subsequently fired him because of the possibility of a recurrence. (*Id.* at 47) After the date of the alleged onset of disability, plaintiff worked periodically in temporary jobs. For one month, plaintiff worked at a farm cleaning horse stalls, but stated that he missed work frequently because his medication made him sleepy. (*Id.* at 44, 49)

Plaintiff also testified that he could not work at the farm because "it [did not] interest [him]," and he did not "like the noise." (*Id.* at 44–45) His last job was a week before the hearing stacking chickens at a chicken processing plant. (*Id.*) Plaintiff worked at the plant for one month, and testified that he "got depressed and left" the job. (*Id.* at 42–43)

Plaintiff stated that his medicine makes him sleepy, but that if he goes without it, he cannot do anything, has trouble sleeping, and feels like he is "in hell." (*Id.* at 42, 49) Even when he is taking his medication, however, plaintiff testified that he sometimes does not want to go to work because he is "too depressed, down in the dumps." (*Id.* at 48) Plaintiff stated that he sometimes feels "like shallow, there's no love, hate some bad, like I don't understand." (*Id.*) He stated that he has episodes when he does not shower or brush his teeth, and just stays in his room, without watching TV or turning on the radio, and "gets scared." (*Id.* at 48–49, 54) Plaintiff also claimed that he does not want to go to work because he thinks that his coworkers are laughing at him because he is not smart, and he specifically mentioned an instance when he lost bladder control at work. (*Id.* at 51) Plaintiff testified that he can work an entire day, but always leaves early because he tells his employer that he is sick. (*Id.* at 53)

Plaintiff stated that the last time he drank alcohol was three to six months prior to the hearing, and the last time he used drugs was five to six years prior to that time. (*Id.* at 42) Plaintiff claimed that he does not have any hobbies, does not watch television or listen to the radio, and that his only friend is his roommate. (*Id.* at 54–55) Plaintiff stated that he is afraid that he will have an accident if he drives a

---

**6.** Because plaintiff did not timely receive the decision of the Appeals Council, plaintiff's deadline for filing an appeal to this court was extended to June 8, 2000. (D.I. 12 at 2)

car. (*Id.* at 57) He claims that he used to hear his deceased mother speak to him, and that he tried to commit suicide a couple of times by cutting his wrist and his hands. (*Id.* at 51–52, 58) Plaintiff also testified that he suffers from pain in his back and legs, for which he takes over-the-counter pain medication. (*Id.* at 57)

### C. Medical Evidence

From December 21, 1996 through December 23, 1996, plaintiff was hospitalized for complaints of seizures, blackout spells, dizziness and loss of bladder and bowel control. (*Id.* at 138) Plaintiff stated that he had run out of his prescribed medication (Mellaril) and had taken six of his brother's Desipramine tablets on the evening prior to his hospitalization. (*Id.*) The attending physician, Dr. Jo Ann Fields, stated that, after treatment to rid his system of tricyclics and placing him on a cardiac monitor overnight, plaintiff's sensorium gradually improved and he was not as withdrawn as he was upon admission. (*Id.* at 138–39) During the hospitalization, plaintiff experienced no seizures, dizziness or falling, and ambulated without difficulty. (*Id.* at 139) An electroencephalogram performed on plaintiff showed slightly abnormal results which indicated a mild disturbance of cerebral activity consistent with chronic dementia, acute encephalopathies or the effect of medication. (*Id.* at 140)

On December 22, 1996, Barry H. Goldstein, M.D. performed a psychiatric consultation at the request of Dr. Field. (*Id.* at 143–46) Prior to the consultation, plaintiff's girlfriend stated that she had never observed plaintiff experience a seizure. (*Id.* at 143) Plaintiff reported to Dr. Goldstein that he had been taking Mellaril regularly until running out four days prior to admission, but later denied taking Mellaril regularly. (*Id.*) After explaining that he had taken his brother's Desipramine two nights earlier to help him sleep, plaintiff stated that his brother was living on Long Island and had been for some time. (*Id.*) Plaintiff denied suicidal ideation, current psychiatric problems and current substance abuse. (*Id.* at 144–45) Dr. Goldstein found plaintiff's mood to be serious and his affect flat. (*Id.* at 144) Plaintiff was oriented to person, place and time, and his short term memory and ability to perform simple calculations were within normal limits. (*Id.* at 145) Dr. Goldstein reported that plaintiff's responses during the examination were off point, but that his thought process was not grossly disorganized. (*Id.*) Dr. Goldstein diagnosed plaintiff with schizophrenia and a Global Assessment of Functioning ("GAF") of sixty,[7] and recommended that he take Mellaril twice daily, but indicated that plaintiff's psychiatric condition was not worsening. (*Id.* at 146) Dr. Goldstein offered plaintiff the option of being transferred to the hospital's psychiatric inpatient program or seeking outpatient care at Kent Hospital Mental Hygiene Clinic. (*Id.*) Plaintiff stated that he was a custodian at Dover Mall and refused psychiatric treatment for fear of losing his job. (*Id.* at 144)

Plaintiff sought mental health treatment at the Kent/Sussex Community Mental Health Center ("CMHC") in January and February, 1997. (*Id.* at 155–68) On January 22, 1997, a CMHC psychiatrist reported that plaintiff was aloof and seclusive, with a flat affect and depressed mood, although his speech was coherent and relevant. (*Id.* at 159) Plaintiff did not display suicidal ideation, and he denied experiencing delusions, hallucinations or illusions.

---

**7.** According to the *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)*, a GAF of sixty indicates moderate symptoms (e.g., flat affect and circumstantial speech) or moderate difficulty in social, occupational or school functioning. (D.I. 18 at 5, n. 3)

(*Id.*) Plaintiff's memory was intact and his concentration adequate, although he appeared drowsy. (*Id.* at 160) The CMHC psychiatrist diagnosed plaintiff with a GAF of sixty. (*Id.*) Plaintiff underwent subsequent medication checks at CMHC in February 1997, during which he reported that he had not experienced any more seizures and was suffering no side effects from his medication. (*Id.* at 156–57)

On May 2, 1997, David Sibley, M.D. performed a consultative psychiatric evaluation at the request of the Delaware Disability Determination Service. (*Id.* at 169–73) Plaintiff reported that his condition had improved on his current medications (Prolixin, Amitriptyline and Thioridazine), but that he still experienced some paranoid thoughts. (*Id.* at 169) Dr. Sibley found that plaintiff did not have symptoms of depression, but at times had a depressed mood and was socially isolated, although plaintiff appeared to be satisfied with his daily activities. (*Id.* at 170) Plaintiff's hygiene seemed diminished, but his attitude, behavior, and cooperation were good. (*Id.* at 172) Dr. Sibley found plaintiff's intellectual functioning to be at or below average and that he was not competent to handle funds. (*Id.* at 172–73) Dr. Sibley diagnosed plaintiff as having chronic paranoid schizophrenia and a history of polysubstance dependency, with a current GAF of forty-five.[8] (*Id.* at 172) Dr. Sibley concluded:

The patient has a history of having successful treatment which allowed him to return to work in the past. He, however, relapsed this year and, although he is receiving treatment, still has positive psychotic symptoms.

Prognosis is guarded due to the chronicity of this illness and the fact that it recurred when the patient was in his 50s if the history is accurate.

(*Id.*)

On May 6, 1997, Martha Jane Merrion, Ph.D. performed a consultative psychological evaluation at the request of the Delaware Disability Determination Service. (*Id.* at 174–76) Dr. Merrion reported that plaintiff stays in his trailer, watching television and listening to the radio, and periodically walks into town to play pool, eat doughnuts and talk with his friends. (*Id.* at 174) The last time plaintiff drank alcohol was four years prior to the evaluation. (*Id.*) Dr. Merrion administered the Wechsler Adult Intelligence Scale–Revised and determined that plaintiff's results were consistent with a low average intelligence. (*Id.* at 175–76) Dr. Merrion reported that plaintiff's history included paranoid schizophrenia, severe substance abuse and abuse of children, although she did not observe any outward symptoms of schizophrenia during the evaluation.[9] (*Id.* at 176) She found that plaintiff had been "irresponsible at work due to missed time because of hangovers from drinking; and he is inactive or non-productive in the home that his

**8.** A GAF of forty-five indicates serious symptoms of serious impairment in social or occupational functioning. (D.I. 18 at 8, n. 6)

**9.** Dr. Merrion described plaintiff's criminal history as follows:

This client has been in trouble with the law in that he was charged with "corrupting the morals of teenage children" when he formerly had children come over to his house to "party and do alcohol and marijuana." The client did not think that this was

wrong; he was placed in jail for three months and had a five-year probation. He also was in trouble with the law for "passing phoney [sic] passports" but received a suspended sentence. About three years ago he tried to rape his 9–year–old stepdaughter, but this was not reported, and he has not been allowed to see this child since she was 12 years old. He reported that he likes to socialize with younger people because he "trusts them more."

(D.I. 12 at 174)

girlfriend manages." (*Id.*) Dr. Merrion also stated that plaintiff lacked insight into his behavior and had a non-caring attitude with respect to self-responsibility. (*Id.*) Dr. Merrion concluded that plaintiff was only mildly impaired in understanding simple instructions and performing routine, repetitive tasks, but was moderately impaired in carrying out instructions and moderately severely impaired in sustaining performance and attendance, and coping with work pressures. (*Id.* at 178)

On May 30, 1997, a state agency physician completed a Psychiatric Review Technique Form, evaluating plaintiff's impairments under Listings 12.03 and 12.09. (*Id.* at 179–90) The reviewing physician determined that plaintiff presented evidence of delusions or hallucinations, and that plaintiff's impairments resulted in a slight restriction of daily activities and moderate difficulty in maintaining social functioning. (*Id.* at 186) Additionally, the state physician found that plaintiff's impairments caused him to often experience deficiencies of concentration, persistence or pace and resulted in one or two episodes of deterioration or decompensation in work or a work-like setting. (*Id.*)

The state agency physician also completed a Mental Residual Functional Capacity Assessment, in which he concluded that all of plaintiff's mental activities were not significantly limited except for the following, which he found to be moderately limited: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in proximity to and interact with others without being distracted or exhibiting behavioral extremes; and the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (*Id.* at

188–89) The reviewing physician concluded that plaintiff "could be able to do simple, non-stressful activities." (*Id.* at 190)

On January 30, 1998, a state medical consultant reviewed and agreed with the state physician's conclusions in the Psychiatric Review Technique Form and the Mental Residual Functional Capacity Assessment. (*Id.* at 193, 195)

Plaintiff returned to CMHC for psychiatric treatment from February 1998 until September 1998. (*Id.* at 198–217) On February 3, 1998, the examining psychiatrist reported that plaintiff was cooperative, friendly, maintained normal eye contact, had a spontaneous manner and normal motor activity, and appeared alert and oriented. (*Id.* at 215–16) Plaintiff's speech was coherent, relevant and spontaneous, and his memory intact. (*Id.*) Additionally, plaintiff's affective status was normal but his affect was depressed. (*Id.*) Furthermore, plaintiff had no evidence of preoccupations, suicidal ideation, delusions, or hallucinations. (*Id.*) The psychiatrist determined that plaintiff's current GAF was sixty-five.[10] (*Id.*)

During subsequent medication checks, plaintiff reported feeling better after he started taking his medication again. (*Id.* at 203, 207) Plaintiff stated that he helped to clean his trailer and care for his five cats. (*Id.* at 199, 206) On May 6, 1998, during a counseling session, plaintiff stated that he was tired of going to work and that he expected to be fired because of his attitude. (*Id.* at 204) On May 20, 1998, plaintiff stated that he had been fired from his job as a dishwasher. (*Id.* at 203) On June 3, 1998, plaintiff reported that he was working at a racetrack, but that the job would end in one and one-half weeks. (*Id.*

10. A GAF of sixty-five indicates only some mild symptoms of depression or some mild difficulty in social or occupational functioning. (D.I. 18 at 7, n. 5)

at 202) In August 1998, plaintiff returned for counseling and reported that he was not needed on the farm where he had worked previously, and was not presently working. (*Id.* at 201)

## III. STANDARD OF REVIEW

■ "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(E) (1999); *see Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). As the Supreme Court has held,

> "substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed.R.Civ.P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

> "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."

*Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983)).

■ "Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) (quoting *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris,* 745 F.2d 210, 221 (3d Cir.1984).

## IV. DISCUSSION

### A. Standards for Determining Disability

Congress enacted the Supplemental Security Income Program in 1972 "to assist 'individuals who have attained age 65 or are blind or disabled' by setting a guaranteed minimum income level for such persons." *Sullivan v. Zebley*, 493 U.S. 521, 524, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (quoting 42 U.S.C. § 1381).

In *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."
>
> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Id.* at 427–28 (internal citations omitted).

For mental impairments, an additional regulatory process supplements the five-step process outlined above:

> [This process] require[s] the hearing officer (and ALJ) to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists. If an impairment is found, the

examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. [FN3] If the mental impairment is considered "severe", the examiner must then determine if it meets a listed mental disorder. If the impairment is severe, but does not reach the level of a listed disorder, then the examiner must conduct a residual functional capacity assessment. At all adjudicative levels, a Psychiatric Review Treatment Form ("PRT form") must be completed. This form outlines the steps of the mental health evaluation in determining the degree of functional loss suffered by the claimant.

---

FN3. § 404.1520a(b)(3) provides for the examination of the degree of functional loss in four areas of function considered essential to work. These areas of activities are: daily living; social functioning; concentration, persistence, or pace; and deterioration or decompensation in work or work-like settings. The degree of functional loss is rated on a scale that ranges from no limitation to so severe the claimant cannot perform these work-related functions. This information is then detailed on a PRT form.

*Id.* at 428 (internal citations omitted).

 The determination of whether a claimant can perform other work may be based on the administrative rulemaking tables provided in the Department of Health and Human Services Regulations (the "grids"). *See Jesurum v. Sec'y of Health & Human Servs.,* 48 F.3d 114, 117

(3d Cir.1995) (citing *Heckler v. Campbell,* 461 U.S. 458, 468–70, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)). The grids require the ALJ to take into consideration the claimant's age, educational level, previous work experience, and residual functional capacity. *See* 20 C.F.R. § 404, subst. P, app. 2 (1999). If the claimant suffers from significant non-exertional limitations, such as pain or psychological difficulties,[11] the ALJ must determine, based on the evidence in the record, whether these non-exertional limitations further limit the claimant's ability to work. *See* 20 C.F.R. § 404.1569a(c)-(d). If they do not, the grids may still be used. If, however, the claimant's non-exertional limitations are substantial, the ALJ must use the grids as a "framework" only. *See* 20 C.F.R. § 404, subst. P, app. 2, § 200(d)-(e). In such a case, or if a claimant's condition does not match the definition provided in the grids, determination of whether the claimant can work is ordinarily made with the assistance of a vocational specialist. *See Santise v. Schweiker,* 676 F.2d 925, 935 (3d Cir.1982).

### B. Application of the Five–Step Test

In the present case, the first two steps of the five-part test to determine whether a person is disabled are not at issue: (1) plaintiff has not engaged in substantial gainful activity since December 30, 1996; and (2) plaintiff's paranoid schizophrenia and polysubstance abuse are severe impairments. Plaintiff contests the ALJ's findings that his impairments do not meet or equal the medical listing for schizophre-

---

11. The regulations list the following examples of non-exertional limitations:

> (i) You have difficulty functioning because you are nervous, anxious, or depressed;
> (ii) You have difficulty maintaining attention or concentrating;
> (iii) You have difficulty understanding or remembering detailed instructions;

> (iv) You have difficulty in seeing or hearing;
> (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or
> (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

20 C.F.R. § 404.1569a(c).

nia, and that plaintiff can perform his past relevant work as a janitor, farmhand or dishwasher.

## 1. Plaintiff's Impairments Do Not Meet or Equal Listing 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders)

The version of Listing 12.03 that was in effect at the time of plaintiff's administrative law hearing provided:

12.03 Schizophrenic, Paranoid and Other Psychotic Disorders: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one or more of the following:

1. Delusions or hallucinations; or

2. Catatonic or other grossly disorganized behavior; or

3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

 a. Blunt affect; or

 b. Flat affect; or

 c. Inappropriate affect;

or

4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors);

OR

C. Medically documented history of one or more episodes of acute symptoms, signs and functional limitations which at the time met the requirements A and B of this listing, although these symptoms or signs are currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of deterioration or decompensation in situations which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms (which may include deterioration of adaptive behaviors); or

2. Documented current history of two or more years of inability to function outside of a highly supportive living situation.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03 (1998).

█ The court concludes that substantial evidence supports a finding that plaintiff's impairments do not satisfy the requirements in Sections B and C, thereby failing to meet or equal Listing 12.03. The Psychiatric Review Technique Form completed by a state agency physician reflects that plaintiff's impairments do not satisfy the requirements of Sections B and C of Listing 12.03. (D.I. 12 at 186–87) Furthermore, plaintiff displayed mild to moderate symptoms of schizophrenia throughout the alleged period of disability which do not

rise to the level of severity mandated by Listing 12.03. Plaintiff regularly displayed coherent speech and intact memory, denied delusions, hallucinations and suicidal ideation, and did not experience seizures after his initial hospitalization. Although he had a flat range and depressed affect, plaintiff acknowledged that he was improving with medication. His GAF averaged around sixty, which indicates mild to moderate symptoms. The medical evidence fails to show that plaintiff experienced repeated episodes of deterioration or decompensation, and the record does not suggest that plaintiff cannot function outside a highly supportive living situation. Thus, the court concludes that the ALJ's finding that plaintiff's impairments do not meet or equal the medical listing for schizophrenia is supported by substantial evidence.[12]

### 2. Plaintiff Can Perform His Past Relevant Work as Farmhand, Janitor or Dishwasher

■ Plaintiff argues that his medical history and repeated failed attempts to work demonstrate that he cannot perform his past relevant work. The court finds that, aside from the diagnosis of Dr. Sibley, a consultative psychiatrist who examined plaintiff once upon request of the Delaware Disability Determination Service, plaintiff exhibited only mild to moderate impairments as a result of his mental illness, which would not prevent him from performing simple, low-stress work. Furthermore, although plaintiff's recent unsuccessful efforts to hold jobs for extended periods cast some doubt on his fitness to work, there is insufficient evidence to suggest that plaintiff left these jobs due to his illness, with the exception of plaintiff's work as a farmhand, which the ALJ classified as an "unsuccessful work attempt."[13] See 20 C.F.R. § 404.1574(a)(1) (1998) ("We will generally consider work that you are forced to stop after a short time because of your impairment as an unsuccessful work attempt."). It is not the duty of the court to weigh the evidence of plaintiff's work history, rather, the court must only determine if there is substantial evidence in the record as a whole to uphold the ALJ's determination. See, e.g., Greenspan v. Shalala, 38 F.3d 232, 239–40 (5th Cir. 1994). In this case, plaintiff's mild to moderate medical symptoms, habits and daily activities, and the absence of proof that he left several jobs because of his illness, constitute substantial evidence to support the ALJ's conclusion that plaintiff can perform his past relevant work as farmhand, janitor or dishwasher.

### V. CONCLUSION

For the reasons stated, the court shall grant defendant's motion for summary

---

**12.** Plaintiff also testified that he suffers from back and leg pain, but the court declines to address these symptoms as a basis for disability. There is no record that plaintiff ever complained of, or sought treatment for, those symptoms during the alleged period of disability. Also, there exists no evidence that plaintiff has any functional limitations resulting from back and leg pain.

**13.** Plaintiff contends that the ALJ's determination that he can perform his past relevant work of farmhand, janitor or dishwasher is inconsistent with the ALJ's finding that his work as a farmhand was an "unsuccessful work attempt." The court finds that a determination of an "unsuccessful work attempt" pertains to whether plaintiff performed any substantial gainful activity during the alleged period of disability. See 20 C.F.R. §§ 404.1574(a)(1) and 416.974(a)(1) (1998). It is relevant to, but not determinative of, whether plaintiff can generally perform his past relevant work. Thus, although plaintiff left one specific farmhand position for medical reasons, this does not preclude the ALJ from concluding that plaintiff can generally perform such work because he is not disabled.

**582**

judgment and deny plaintiff's motion for summary judgment. An appropriate order shall issue.

### ORDER

At Wilmington, this 25th day of March, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Defendant's motion for summary judgment (D.I.17) is granted.

2. Plaintiff's motion for summary judgment (D.I.15) is denied.

3. The Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

4. The Clerk of Court is directed to substitute Jo Anne Barnhart, Commissioner of Social Security, as defendant in this action pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g).